**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**ELIZABETH O. FELLEMAN,**
1210 Highway 36
Middletown, NJ 07732

    *Plaintiff,*

v.

**SECURITIES INVESTOR PROTECTION
CORPORATION ("SIPC"),**
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006-1620

       Serve: Michael Post, Esq.
             SIPC General Counsel
             1667 K Street, N.W.
             Suite 1000
             Washington, D.C. 20006-1620
and

**CLAUDIA SLACIK,** In her capacity as
SIPC's Chair of the Board
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006-1620

and

**JOSEPHINE WANG**, In her capacity as
SIPC's Chief Executive Officer
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006-1620

and

**CHARLES GLOVER**, In his capacity as
SIPC's Vice President of Finance
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006-1620

and

**Civil Action No.:  1:23-cv-2994**

**JURY TRIAL DEMANDED**

1

**KAREN SAPERSTEIN**, In her capacity as
SIPC's Vice President of Operations
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006-1620

     *Defendants*.

## COMPLAINT

Plaintiff, Elizabeth O. Felleman ("Plaintiff" or "Felleman") brings this action against Defendants Securities Investor Protection Corporation ( "SIPC"), and SIPC's Chair of the Board of Directors, Claudia Slacik ("Slacik"), Josephine Wang, SIPC's Chief Executive Officer ("Wang,") Charles Glover, SIPC's Vice President of Finance ("Glover"), and Karen Saperstein, SIPC's Vice President of Operations ("Saperstein"), and collectively as ("Defendants") to redress violations of Defendant SIPC's negligence and negligent supervision, and its actions in breaching its fiduciary duties to Felleman and constructively discharging Felleman; and to redress violations of Defendants Slacik, Wang, Glover, and Saperstein for negligence and negligent infliction of emotional distress .

## BACKGROUND

1.    This action arises out of the actions and inactions of SIPC in connection with SIPC's creation and development of a broker-dealer portal ("Portal") beginning in or around September 2019 and continuing through the date Felleman was constructively discharged from her employment with SIPC on December 19, 2022.

2.    As SIPC's Manager - Investments, Felleman was directly responsible for managing a $4 billion portfolio of Treasury securities, including performing trades and monthly revenue reconciliations, and preparing financial reports.

3.      In or around September 2019, SIPC contracted with InfernoRed Technology, Inc. to develop a Portal which was intended to streamline the processing by SIPC of membership information as well as the payment and collection of members' assessments, and to facilitate the submission of member assessment forms.

4.      While initially intended to go live in or around June 2020, the Portal was still under development as of the date of filing of the instant Complaint. According to a recent announcement by SIPC, the Portal is not expected to go live until the end of 2023.

5.      From the time SIPC's Board of Directors ("SIPC's Board") approved the first Statement of Work ("SOW") between SIPC and InfernoRed, through the time SIPC wrongfully discharged Felleman, SIPC's Board knowingly permitted InfernoRed to grossly overcharge SIPC for its services and to delay implementation of the Portal without consequences to InfernoRed.

6.      During the period of time referenced in Paragraph 5, Felleman on numerous occasions made Slacik, Wang, Glover, and Saperstein aware of her concerns about the planning and implementation of the Portal, including its status, flaws in its design and management, its dysfunction, potential vendor fraud, potential conflicts of interest, and the ramifications of SIPC's Finance Department being intentionally removed from discussions surrounding the Portal.

7.      Some of the concerns raised by Felleman to Slacik, Wang, Glover, and Saperstein implicated violations of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.* ("SIPA").

8.      On or around April 7, 2023, Felleman filed a complaint with the Securities Exchange Commission ("SEC" or "Commission") ("SEC Complaint") regarding SIPC's noncompliance with the SIPA. As of the date of the filing of the instant action, the SEC is still investigating Felleman's SEC Complaint.

9.      Felleman had made Slacik, Wang, Glover, and Saperstein aware that because of her status as a licensed Certified Public Accountant and Chartered Financial Analyst, she was bound by certain ethical duties under the AICPA Code of Conduct. Felleman informed them the AICPA Code of Conduct prevented her from remaining on the Portal project and even from continuing her employment with SIPC, if they did not take necessary and appropriate action to address her concerns about the Portal.

10.     Felleman was also bound by the CFA Institute's "Code of Ethics and Standards of Professional Conduct," ("CFA Code") which placed upon her a duty of loyalty to the client--SIPC's members--and to act with reasonable care and to exercise prudent judgment. The CFA Code also required Felleman to act for the benefit of SIPC's clients—its members—and to place their interests before SIPC's or her own interests. If Felleman did not do so, she could have faced sanctions from the CFA Institute, including, but not limited to, having her CFA membership and the right to use the CFA designation revoked.

11.     Rather than take any action to correct the issues Felleman had brought to their attention, Slacik, Wang, Glover, and Saperstein attempted to silence Felleman with implied threats of termination.

12.     Knowing that Slacik, Wang, Glover, and Saperstein were not going to address her grave concerns about the Portal, and knowing their actions and inactions would cause her to violate the AICPA Code of Conduct and the CFA Code, Felleman had no choice but to resign from SIPC.

13.     On December 19, 2022, Felleman was constructively discharged from SIPC.

## **PARTIES**

14.     Plaintiff Elizabeth O. Felleman is an individual who was employed by SIPC as its Manager - Investments from October 29, 2018, through December 19, 2022. At all times relevant

to the allegations herein, Felleman performed work for SIPC at its office in the District of Columbia. Since April 2023, Felleman has been a resident and citizen of the State of New Jersey.

15.     Defendant SIPC was created under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA") as a non-profit membership corporation. 15 U.S.C. § 78ccc(a)(1). SIPC's members are registered securities brokers and dealers. *Id.* at § 78ccc(a)(2)(A).

16.     "SIPC oversees the liquidation of member firms that close when the firm is bankrupt or in financial trouble, and customer assets are missing. In a liquidation under the Securities Investor Protection Act, SIPC and the court-appointed Trustee work to return customers' securities and cash as quickly as possible." SIPC - Mission.

17.     At all times relevant to the allegations herein, SIPC's Chair, Officers, and Board (including Slacik, Wang, Glover, and Saperstein) directed, controlled, and coordinated SIPC's activities in the District of Columbia. Further, SIPC's Bylaws provide that, "[t]he principal office of SIPC shall be in the city of Washington, District of Columbia." SIPC Bylaws, Article 1, Offices.

18.     Defendant SIPC is incorporated in the District of Columbia and is governed by the District of Columbia Nonprofit Corporation Act. 15 U.S.C. § 78ccc(a)(1)(B).

19.     Because SIPC is incorporated in the District of Columbia and its nerve center is located in the District of Columbia, SIPC is a citizen of the District of Columbia.

## JURISDICTION AND VENUE

20.     Felleman is requesting that this Court award her damages in the amount of $1,500,000 plus attorneys' fees.

21.     At all times relevant to the allegations herein, Felleman was a citizen of the Commonwealth of Virginia. Since April 2023, Felleman has been a resident and citizen of the state of New Jersey.

22.     SIPC is a citizen of the District of Columbia. *See* Paragraphs 17-19, *supra.*

23.     Because the amount in controversy exceeds the statutory minimum of $75,000 and complete diversity exists, this Court has diversity jurisdiction of this civil action. *See* 28 U.S.C. § 1332(a)(1).

24.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2), because the acts and omissions which are the subject of the allegations herein occurred within this judicial district.

## STATEMENT OF FACTS

25.     Felleman is a Certified Public Accountant and a Chartered Financial Analyst. As such, she is bound by the American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct as well as the CFA Institute Code of Ethics and Standards of Professional Conduct ("CFA Code").

26.     SIPC hired Felleman as its Manager - Investments on October 29, 2018. At the time of Felleman's employment with SIPC, there were seven (7) people who worked in SIPC's Finance Department: Felleman, Glover, Julie McIntosh (Felleman's Direct Supervisor), Alexandria Young (Junior analyst), and Bryant Riquelme (Accounts Payable), Marjorie Johnson (Payroll), and Karen Winklebauer (Admin). Glover determined whether money was being spent properly. Felleman was part of the approval process, posting and approving entries in SIPC's general ledger.  As such, she was very much aware of SIPC's expenses.

27.     Prior to joining SIPC, Felleman worked at the Board of Governors of the Federal Reserve in Washington, DC, in the role of Supervisory Financial Analyst; and as a Senior Vice President and Controller for nearly ten years at Avidbank in California.

***SIPC's IT Department, its Executive Leadership, and InfernoRed intentionally ignore Felleman's expressed concerns about the Portal Project:***

6

28. SIPC had a formal process to select the IT developers, and SIPC's own IT Department was the winner of the selection process. In or around August 2019, SIPC's IT Department, headed by the IT Department's Manager Robert Ferry ("Ferry"), offered SIPC's IT Department's services to develop a Portal for SIPC along with various software developers.

29. Less than one month later, SIPC's IT Department claimed they would not be able to handle the Portal Project themselves. Accordingly, on September 27, 2019, SIPC entered into a Consulting Agreement with InfernoRed for an indeterminate period of time ("until completion of the Services") by which InfernoRed would provide "consulting services as may from time to time be set forth in one or more Statements of Work ["SOW"]." ("Consulting Agreement").

30. SIPC selected InfernoRed without engaging in an open contractor selection process. On information and belief, Ferry is personal friends with InfernoRed's President Scott Lock ("Lock") and other members of InfernoRed's team who were chosen to work on the Portal with SIPC.

31. According to the SOW entered into between SIPC and InfernoRed on September 27, 2019 ("September 2019 SOW"), InfernoRed would provide "an experienced Project Manager to work with [SIPC'S] IT and business stakeholders…to achieve SIPC goals," as well as "an experienced software engineer…to support [SIPC'S] development staff during the development of the portal, back-end system changes needed to support the portal, and supporting services including implementation, change management, and training."

32. The September 2019 SOW also provided that SIPC's "functional stakeholders will be identified and will have time allocated to assist with functional testing on a bi-weekly basis." Under the Consulting Agreement, InfernoRed would submit monthly invoices to SIPC, "with each invoice covering the Consulting Fee accrued during the immediately preceding month." According

to the September 2019 SOW, InfernoRed's consulting fees were $165/hour for its Senior Developer Dave Ferguson and $165/hour for its Project Manager Patricia Bailey.

33.    Neither the Consulting Agreement nor the September 2019 SOW contained any caps as to the fees which InfernoRed could charge SIPC, nor did either document break down the work to be done into project phases. The September 2019 SOW had a specified termination date of June 30, 2020. The Consulting Agreement enabled SIPC and InfernoRed to extend the terms of the Consulting Agreement by entering into a mutually agreeable written instrument.  On September 27, 2019, Josephine Wang signed the SOW as SIPC's President and CEO, and Scott Lock signed the SOW as InfernoRed's President.

34.    On September 27, 2019, Felleman discussed with Ferry her concerns about Josephine Wang's decision to preclude SIPC's IT Department from doing any more work on the Finance Department's requests for needed reports and improvement in the Membership Management System (MMS), because Wang had determined that the Portal was SIPC's number one priority. During this conversation, Felleman told Ferry that her request for the Finance Department to have direct access to the Portal was denied, to which Ferry replied, "You think the portal is this database that you can log into, and it is not going to be like that." Felleman responded that is not what she said that she had requested Finance be given the same information as what the data feed would be from the Portal to MMS. Notably, Ferry was consistently averse to providing information directly from outside sources to Finance, even though Finance needed such information for reconciliation purposes.

35.    In or around September 2019, Felleman first presented her ideas on the need to change the way the database functioned in order to calculate the complex calculations that would

be necessary in the Portal. This information was summarily dismissed by Christine King (in SIPC's Membership and HR Departments), who deemed the information not worthwhile to consider.

36.     Between September 2019, and March 2020, there was a significant amount of discussion between InfernoRed and SIPC's Membership and Finance Departments regarding their requirements for the Portal. In April 2020, Felleman told Wang that Finance was being denied access to the database, and she did not understand why they were being denied this information. Wang appeared supportive of Felleman's expressed concern and allowed Finance access to the database. However, this access was short-lived, only lasting a few months. A consistent pattern by SIPC's IT Department and InfernoRed of withholding information from Finance and ignoring their requests was forming.

37.     In April 2020, Abe Wons (SIPC's Portal Project Manager from its inception through December 2, 2020) announced that a new InfernoRed developer, Colleen Tibbs ("Tibbs"), was being brought in to create a project plan, as Patricia Bailey ("Bailey") (InfernoRed's Portal Project Manager) had been unable to create such a plan. In an April 8, 2020, email discussing the remaining work on the Portal, Tibbs informed Wons, Ferry, *et al* that InfernoRed was "specifically calling out work that may have been discussed but is now out of scope for delivery in 2021." The plan developed by Tibbs in May 2020 failed to include many of Finance's requirements for the Portal. Despite protests by Finance, the project plan was never changed to include their requirements.

38.     On May 14, 2020, Felleman emailed Wons (and copied Julie McIntosh ("McIntosh")-to whom Felleman directly reported), Glover (to whom McIntosh directly reported), and Alexandria Young (Junior Analyst in SIPC's Finance Department), providing a list of items that she thought should be added to the new enhanced version of the Membership Management System (eMMS) task list in the Portal Project plan. Felleman requested to add the following items

to the Portal Project plan: Assessments paid tracked by fiscal year and form for each broker/dealer; Overpayment amounts tracked by fiscal year and form; Interest amounts paid and due tracked by fiscal year and form; Use of effective dates different than six months; Ability to retrieve data as of a specific date in the database, including the storage of all relevant dates for each transaction; Determining how to integrate new and old data; Review of database architecture by all stakeholders to ensure necessary information will be captured; Creation of database architecture that allows amendments to but not changes to database data; Establishment of database access and edit controls to ensure that changes are not made to database data; Means to verify that the data in MMS matches what was entered into the portal and through Aliaswire; and Establishment of processes to verify database data on an ongoing basis. Bailey was copied in Won's May 20, 2020, email response, in which he told Felleman that Bailey told him her requests were already included in the eMMS list.

39.     On May 22, 2020, Bailey responded to Wons' May 20, 2020, email (and included Felleman), stating that most of Felleman's items "have been taken into consideration for work that is already completed." Bailey commented on each of Felleman's requested items, stating for the most part that those items had already been addressed as part of the SIPC form work.

40.     In Felleman's May 22, 2020, email response to Bailey (and copying Wons, McIntosh, Young, and Glover), she pointed out in detail how those items involved more than just tracking information that comes in on a form.

41.     Several of the Finance Department's denied requests for the project plan directly impact SIPC. For example, in Felleman's May 22, 2020, email reply to Bailey, she expressed concerns about SIPC's ability to retrieve data as of a specific date, because retrieval was reliant on a time stamp for when each item was stored in the database. Felleman explained that, "[t]he ability

to do this is destroyed when data can be changed in the database rather than being updated…You would not go in and change what was already entered in the database. This way, you are not losing any information, and you have a record of what was changed and when. ***Since this is our official record of our revenue, data cannot be[] changed without a record.***" Emphasis added.

42.     Regarding Felleman's request to add the item "Review of database architecture by all stakeholders to ensure necessary information will be captured," Bailey responded that, "[t]he team will be producing a data dictionary for the schema." In Felleman's May 22, 2020, email reply to Bailey, she explained: "I was not referring here to an after the fact documentation of what the fields that were set up in the database. Since the new calculations for overpayments and interest are complicated, I think there is a need for all stakeholders to review the new fields and method of calculation for these prior to implementation."

43.     On May 29, 2020, Bailey emailed Felleman, saying, "[s]ince the form submission process is almost complete, it has been verified that data is being captured." Felleman replied to Bailey via email that same day (and copied Wons, McIntosh, Young, and Glover), saying, "it seems that you will not be including these items in the project plan that is due to be provided to SIPC on Monday. I am unclear as to why these items cannot be added."

44.     On June 28, 2020, Felleman emailed Tibbs (and copied McIntosh, Glover, and Young), reminding her that the numerous requests made by the Portal Finance Committee for the Portal had been ignored since September 2019. While Tibbs had previously responded that these items would be investigated and/or discussed with the Portal Finance Committee, no such action had been taken. Felleman plainly told Tibbs, "it is unfortunate that so much time has been ***wasted*** by ignoring our concerns." (Emphasis added).

45.     On July 3, 2020, Felleman reached out to McIntosh, Glover, and Young, once again expressing her frustration with Tibbs's failure to respond to the Portal Finance Committee's legitimate concerns about the Portal. Felleman informed them that Tibbs's "comments show a continued effort to ignore or stall the implementation of our requests." It became abundantly clear that as of July 2020, InfernoRed had stopped working with SIPC's Finance Department but continued to work with its Membership Department ascertaining the latter's requirements for the Portal.

**SIPC takes action to silence Wons and Felleman:**

46.     On December 2, 2020, Wons emailed Felleman and other members of the Finance Department, informing them that a two-week pilot project was being initiated in which Rashmi Sasikumar (SIPC's IT Department Developer) would work with Michelle Mitchell (InfernoRed Consultant) to deliver the reports piece of the Portal Project. Less than two weeks later, on December 14, 2020, Wons emailed Felleman, McIntosh, Young, King, and Glover, informing them that the pilot project was being cancelled, and he "will be no longer part of the effort."

47.     Wons' abrupt removal from the Portal Project occurred immediately after he complained to Wang about InfernoRed being incompetent and asked Wang to terminate InfernoRed's services on the Portal project.

48.     On December 21, 2020, Wang emailed Wons and members of the Finance Department and copied Saperstein, Kenneth Caputo (SIPC's General Counsel at that time), Glover, Ferry, and Bailey, informing them that, going forward, communications with the developers were being streamlined, "so that answers that the developers need, are provided with much specificity, and the developers can move forward quickly in their work." ***The basis for this change, Wang stated, was because "the [Portal] project [they had been working on for over a year] is over***

***budget and behind schedule. It is clear that we underestimated the magnitude of the project.***"
(Emphasis added).

49.     From the inception of the Portal project, Felleman had repeatedly informed SIPC leadership including Wang, Glover, and Saperstein, of the significant scope and magnitude of the project. In the initial project plan prepared by SIPC's IT department, entitled the Membership Portal MMS Enhancements Project Plan, dated August 23, 2019, Finance made extensive revisions to the initial document noting additional changes that would be needed for the project to succeed. Until December 21, 2020, SIPC leadership ignored Felleman's assessment of the magnitude of the project.

50.     Per Wang's December 21, 2020, email, SIPC's non-IT staff members could only bring their questions about the Portal to their respective Department Heads, and IT staff members could only bring their questions to Ferry. Wang further prohibited direct communications between non-IT staff members and IT unless such communications were being conducted in a formal meeting or pursuant to permission granted by either the non-IT staff member's Department Head or Ferry. Ferry and Bailey were given the responsibility to consult regularly with each other "as to the work that needs to be done," and Bailey would be "responsible for tracking the progress of the work." Lastly, if this process were not working, or if anyone had concerns, SIPC staff members were instructed to direct their concerns only to Wang or Ferry, or by InfernoRed staff to Scott Lock. With these communication restrictions, Wang predicted the Portal would be ready to go live by the end of 2021.

51.     On December 23, 2020, Wang and Lock signed another SOW, with an effective date of January 1, 2021, and a termination date of June 30, 2021. Per the terms of the December 23, 2020, SOW ("December 2020 SOW"), InfernoRed was to provide "experienced software

engineers and…additional staff as agreed upon by [SIPC] to support the development of the Broker Dealer Portal, eMMS and Reporting." Further, InfernoRed would "finalize the delivery requirements for the Broker Dealer Portal by working directly with Robert Ferry," and would "***deliver the Broker Dealer Portal the end of 2021***." (Emphasis added).

52.    The December 2020 SOW also stipulated that SIPC would assign Ferry as the point of contact between SIPC and InfernoRed for the duration of the December 2020 SOW, and further, that no member of SIPC staff could communicate directly with InfernoRed, and no member of InfernoRed could communicate with SIPC staff "outside of a formal meeting" or without the permission of SIPC's Department Heads or Ferry.

53.    Significantly, since 2019 when SIPC first began soliciting bids to work on the Portal, Ferry had been working to exclude the Finance Department from involvement with the Portal project. Ferry routinely criticized Felleman's abilities and the comments she made during meetings in which the Portal project was discussed. With the December 2020 SOW, and the concomitant communication restrictions imposed by Wang per her December 21, 2020, email, the ability of Felleman and SIPC's Finance Department to exert any influence over the development of the Portal had been completely excised. Now, Ferry, Wang, Saperstein, Bailey, Tibbs, and Lock had full and unfettered reign over the Portal Project.

54.    Despite this lack of intrusion by the Finance Department into the decision-making process of creating the Portal, the Portal Project was not completed by January 31, 2021. Apparently, the "streamlined communications" dictated by Wang in December 2020 were not enough to complete the Portal Project by January 31, 2021. In fact, as of the date of filing the instant Complaint—nearly four years after SIPC and InfernoRed entered into the Consulting Agreement and September 2019 SOW--the Portal Project is still under development.

***In 2022, SIPC's Senior Management repeatedly tells Felleman to "stop worrying" about the Portal Project:***

55.     In SIPC's 2021 Annual Report to the SEC, Chair Claudia Slacik stated in her "Message from the Chair": "Modernization includes not only the ongoing migration to the cloud of SIPC services and applications, but the creation and development of a broker portal. The portal, which SIPC expects to deploy in 2022, will make it easier for members to file assessment forms with SIPC and make payments to it, *and on the back end, will facilitate SIPC's processing of the information and payments.*" (Emphasis added).

56.     On March 24, 2022, Felleman told Saperstein that the wording in Slacik's Letter to the Chair of the SEC in SIPC's 2021 Annual Report was inaccurate, because that wording implied the Portal was going to facilitate processing on the back end for the Finance Department. Felleman told Saperstein that the Finance Portal Committee had requested improvements which would permit greater accessibility and usability, but their requests had been denied. As a result, Felleman explained, the Finance Department was not expecting any improvements in their processing on the back end, and they were just hoping they (the Finance Department) could continue to do their jobs.

57.     Immediately after their conversation, Saperstein informed Glover of what Felleman told her.  Glover then contacted Felleman and admonished her for saying what she did to Saperstein. He also told Felleman that because of Wang's nature, they could not disagree with her. Upset by what Glover was telling her, Felleman expressed she was very unhappy about the way she had been treated on the Portal Project. Felleman asked Glover if she could be removed from the Portal Project, which request he denied. She told him that the Portal Project was making her shake, and that she had gone to a doctor about the stress levels she was experiencing at work. Glover said that because Felleman is the Investment Manager, she must stay on the Portal Project.

Dismissing the entirety of her concerns, Glover condescendingly suggested to Felleman that she not get upset about the Portal Project and not take it personally.

***Felleman blows the whistle on SIPC's illegal practices concerning the Portal Project:***

58.     Having tremendous integrity and a commitment to doing her job in an ethical manner, Felleman was unable to not get upset about the Portal Project. Not being able to endure being silenced or condescended to anymore, Felleman met with SIPC's Chair of the Board, Claudia Slacik, on or around July 25, 2022, to voice her concerns about the broker dealer Portal Project at SIPC. Then, on September 1, 2022, Felleman submitted to Slacik a letter she wrote, in which she reiterated her concerns "regarding the fraud and waste I have observed and to request your help in alleviating the abusive conditions I am experiencing in my position as Manager-Investments in the Finance Department." ("Felleman's September 2022 Letter to Slacik").

59.     In Felleman's September 2022 Letter to Slacik, Felleman stated that: [t]hrough my participation in the project, I have seen improper, irresponsible, incompetent, and unethical behavior in the planning and implementation of the portal project on the part of Bob Ferry (AVP IT) and members of the consulting firm InfernoRed. This behavior is reflective of the poor design, poor management and hostile environment of the project. Many of the behaviors of Bob Ferry and InfernoRed also show up as red flags for vendor fraud. I have repeatedly expressed my concerns to senior management, but their dedication to Bob Ferry and InfernoRed is unwavering. Therefore, I am reporting these issues to you."

60.     In Felleman's September 2022 Letter to Slacik, she set out in extensive detail her specific concerns, which include, but are not limited to, the following:

Regarding "Project status," Felleman wrote:

The portal as it has been developed relies on flawed design and provides inconsistent and inaccurate results which limits its functionality and challenges its viability. The following issues are present in the system today:

1.      Brokers may be provided with incorrect and/or conflicting balance due information in some circumstances. Testing has revealed instances where breakdowns of balances by form do not add up to the total, or the amount due in the portal does not match that listed on the form.

2.      Interest charges do not adhere to SIPA in some cases. Charges are inconsistently assessed.  Specifically, SIPC will retain interest if it is paid, but reverse the interest charge if not paid, when a second form is filed for the year. The end result is that brokers that pay their interest at form submission are potentially penalized, being charged more than if they had not paid…

3.      The newly redesigned SIPC 6 and SIPC 7 forms, developed by InfernoRed and Membership without the input or approval of Finance, are unnecessarily complicated, and do not adhere to the fundamental logic behind the amount due calculation. Descriptions for lines on the form do not match the numbers shown. Actual amounts previously paid are not presented specifically on the forms, making it hard for a broker to decipher how their balance due was arrived at.

4.      The reports that Finance relies on to reconcile assessment and interest received are not completely developed.…

In spite of these issues, InfernoRed, IT, and senior management insist that the project is almost complete, and the portal will launch to the public on December 1, 2022. Senior management's desire to complete the project has taken precedence over prudent behavior. I believe that releasing the portal as it stands now would cause SIPC public embarrassment.

Regarding "Project design," Felleman wrote:

At the outset, Finance had hoped for a new system that would be an improvement over the current MMS system. MMS has deficiencies in reporting capabilities, data security and integrity, and requires manual entry of some information. Unfortunately, the new system, eMMS, retains the flaws that were in the original MMS. Finance's needs and requests for enhanced capabilities and refinements were ignored by IT, InfernoRed, and senior management.

The new system was designed and developed apparently without a correct understanding by InfernoRed and Membership of what data and calculations are needed to accurately determine and maintain broker dealer assessment balances. Extensive efforts by Finance during the project to educate others about the calculation methodology were rejected. Membership has insisted on coming up with an alternate methodology and new forms, and senior management has ordered

17

Membership's forms to be used despite having been warned by Finance that the calculation methodology used is incorrect.

It is clear that a broker should be able to know what his firm's balance due is by knowing the general assessment and the amounts paid for each fiscal year. A broker's balance would be the sum of all the general assessment charged plus interest minus any payments that he has made. Yet when I asked the developers how they were checking the validity of the system calculations, no one answered. Patricia Bailey, Project Manager for InfernoRed, made excuses for why they were not doing this, remarkably saying, 'we just use the numbers that are in the system,' 'there is more than one correct answer,' and 'we do our numbers a different less complicated way.' Those with experience in Finance know that there is in fact one right number that is the balance for a broker.

Felleman also wrote of the Project Design: "No written documentation has been created by InfernoRed detailing the system specifications and methodology, and recently Josephine Wang confirmed that they will not be required to do so. Finance is forced to guess what IT and InfernoRed have developed."

Regarding "Project management," Felleman wrote:

The project has operated without…fundamental project management features including timelines, specific milestones, testing plans, and…written specifications. There are no cost limitations in the contract and statement of work with InfernoRed. SIPC has paid InfernoRed $3.8 million for the project thus far for work through July 2022, at an average cost of $131,000 per month thus far in 2022. ***The earliest that management is projecting completion of the project is December 2022, at which time the total cost of the project would likely be $4.4 million.***" (Emphasis added).

Of note is the fact that at least one member of the SIPC IT department is reportedly personal friends with the head of InfernoRed and other members of the InfernoRed team, raising concerns of conflict of interest. A decision was initially made to use only SIPC's IT department for development of the portal. It was argued that they could save money by doing all of the development in house. Yet, shortly after the project was awarded to the IT department, they reported that they would need additional resources. ***InfernoRed was brought on without an open selection process, under a contract that was signed less than a month after IT was awarded the project. Now, the $3.8 million cost of the project is many times higher than the total cost presented by several of the other software developer proposals considered and is about the same as a proposal by FINRA which was deemed at the time as prohibitively high***."  (Emphasis added).

18

Regarding "Project dysfunction," Felleman wrote:

> Those with financial expertise have been removed from the process or are ignored.
>
> From the very beginning, IT, InfernoRed and Christine King of the Membership Department aimed to exclude Finance's requests and requirements from the project. Requests from Finance regarding information on project specifics, including financial calculation methodologies, control requirements, database structure, testing protocols, contingency plans, and cutover procedures were ignored or refused. IT and InfernoRed have used a myriad of excuses in order to withhold information, including that IT was too busy to prepare information, that Finance won't understand the information, and by issuing the accusation that in asking for the information, Finance was 'overstepping its bounds.'…I see these excuses as signs of obstruction and possibly deceit.
>
> Josephine Wang has supported the exclusion of Finance, specifically prohibiting Finance from receiving requested information, cancelling regular portal update meetings, and prohibiting contact between Finance and InfernoRed consultants without Bob Ferry's approval or in formal meetings….Individuals who have questioned the project process and the abilities of InfernoRed have been ignored, had their project involvement restricted, or were removed altogether from the project.

Felleman expressed "Other concerns," including, but not limited to, the following: "The only way for Finance to access data is to use a report that has been written by IT. This is in contradiction to accepted IT internal controls best practices which recommend transparency and accessibility to improve data integrity."

Felleman then went on to provide facts supporting her concerns about "Potential Fraud" relating to the Portal and the contract entered into between SIPC and InfernoRed. She stated:

> Here is a list of signs of potential vendor fraud taken from various sources that I think are evident on this project:
>
> 1. Unjustified favoritism of a vendor in spite of excessive cost
> 2. Unjustified favoritism of a vendor in spite of poor performance
> 3. Untrue statements by the vendor and management
> 4. Lack of transparency on progress to stakeholders
> 5. Discrepancies between reported progress and testing results
> 6. Refusal or inability to provide supporting documentation
> 7. Lack of organizational project structure

8.     Personal relationship rumors between employees and vendor
9.     The exclusion of individuals who have necessary expertise
10.    Unspecific contracts
11.    High volume of complaints from testers
12.    Work delivered does not meet specifications

I believe that Bob Ferry and others' behavior may be in violation of SIPC's Code of Conduct, and SIPC's Harassment and Workplace Civility Principles. I question whether there is also fraud.

As a CPA and CFA, I operate under a code of professional ethics. It is my duty to report suspected fraud, and I take this duty seriously.

Felleman asked Slacik to "provide some relief" to her regarding the abuse to which Felleman was being subjected. Under the heading "Personal Treatment," Felleman wrote:

During the project, Bob Ferry and Patricia Bailey of InfernoRed routinely lied to me and treated me with a lack of respect and with dismissive behavior. ***I believe I am being treated this way as a means to discredit my efforts to uncover the incompetence and possibly criminal activity of Bob Ferry and InfernoRed.***" (Emphasis added).

Karen Saperstein and Josephine Wang did nothing to stop this cruel treatment. My complaints were ignored or met with the response that I am too negative. I was told by Karen Saperstein that I need to 'cheer up.' She said that Bob Ferry is like this to everyone, not just me. Another individual told me I was not allowed to complain about the portal, that I needed to keep quiet, and just collect my paycheck. I asked Charles Glover if I could be taken off the project and that request was denied.

…A former member of the IT department [told me that], members of the IT department stated that '[Finance] can't tell us [IT] what to do, we will force Finance to do it our way.'

I reported the personal toll this has taken on me to senior management and HR. Karen Saperstein, Charles Glover and Christine King are all aware of this situation, but I know of no measures taken to alleviate it…I want to note that I have a neurological condition called essential tremor which is exacerbated by stress. Some individuals at SIPC are aware that I have this condition. I merely have to start discussing the portal project for my hands to display shaking behavior.

Felleman concluded her letter by stating, "I am hopeful that you and the Board will take action to improve this situation for the benefit of SIPC, and for my personal well-being."

61.     On September 7, 2022, Felleman was notified by Hemant Sharma, Senior Associate General Counsel at SIPC, that the Morgan Lewis law firm would be conducting an investigation into the concerns she raised with Slacik.

62.     During a meeting with the Portal group and Julie McIntosh (to whom Felleman directly reported) on September 27, 2022, Felleman brought up that she had determined the interest allocation which Membership had specified for the Portal Project was incorrect. McIntosh dismissed Felleman's concern, stating that because the difference between their interest calculation and the batch report was minimal, she was not inclined to pursue it further. On September 30, 2022, McIntosh admonished Felleman for raising this concern during their meeting, as it made the Finance Department "look bad."  Felleman began to cry during the September 30, 2022, call with McIntosh, telling her that it was hard to do her job knowing that all of her work was being ignored. Felleman added that perhaps it was time for her to go (i.e., leave SIPC). McIntosh further admonished Felleman for sending out a list identifying seven other brokers for whom Felleman had found errors in their interest allocations. She further told Felleman she was spending too much time on this problem, and that she needed to move on because they have plenty of work to do. She told Felleman not to think too much about the Portal Project. Felleman told McIntosh that her request to be removed from the Portal Project had been denied, to which McIntosh replied that Felleman, as the Investment Manager, had to rely on the system to perform her job. Just as Glover did, McIntosh informed Felleman that the Finance Department had no choice but to do what Wang instructed them to do.

***Felleman is warned about the consequences of going against SIPC's senior management:***

63.     A couple of days later, on or around October 7, 2022, Glover and Felleman talked about their not communicating with one another since July 2022. Glover said he knew that

Felleman was upset about the Portal Project. Glover explained that he had been at SIPC a long time—37 years-- and he knows its culture: that Finance does whatever Operations and the CEO want done. Glover said, "I know there is more to a job than that [salary] but we have constraints at SIPC because of management. I mean, as I said, we can fight, we can argue, do all this stuff **but all it's going to do is hurt the person who is you know challenging what they want to do**." Glover continued by saying he thinks the Portal Project has taken "its toll" on Felleman. Referring to the Finance Department's expressed concerns about the Portal Project, he said that, "it's not going to change the way they are doing things." Glover admitted that because of the silence which was forced upon him, "It's been disheartening for me for decades...I've had some awful moments at SIPC." Glover told Felleman about a former employee, Pat Kennedy, who, despite his insistence that she stay at SIPC, resigned because "she couldn't be here anymore…[i]t was more than she could take."

64.     Glover also, however, admonished Felleman, telling her that: "we just don't want to hold up the project by going over the same thing again and again and again. When they are not being receptive. You can't force them to be receptive. No matter what you do. I've had issues here myself and it's been painful, there have been some painful years here but I did learn to move on…I wish I could say that somehow I wish there is going to be an epiphany with the portal team but there is not going to be an epiphany and they are not going to suddenly wake up and say, 'oh wow she's [Felleman] right.'"

65.     When Glover asked Felleman what her options were, she replied, "leaving [SIPC] apparently." When he asked her about her options for remaining at SIPC, she said, "it doesn't sound like there are any." She continued, "It's not something that I look for in a job where I am kind of shut down…I just have to figure out what to do." Felleman reiterated her concerns to

Glover about the system being used in the Portal, saying, "We have a very poorly guarded system, the integrity of the data, the integrity of the numbers—it's all suspect given the IT that we have, and it carries through to everything."

66.     Glover talked to Felleman about Abe Wons' former involvement in the Portal Project, and why his involvement was stopped: "this is Abe talking and being very forceful in his argument about the deficiencies about InfernoRed you know, and he gets removed…They don't want to hear it…He was being disrespected as well when he made arguments about InfernoRed." When Felleman said in response she did not understand why this had continued to exist for 30 years, Glover replied, "Because Legal runs everything and this company and it has gotten worse."

67.     Glover proceeded to tell Felleman that in his experience with SIPC, he observed the following when SIPC hired an outside consultant or investigator to look into concerns that had been raised: "they [the outside consultant or investigator] side with the person who hires them or pays them [SIPC] and they want to get the next gig from the company….They seldom want to bite the hand that feeds them. That is my sense of things."

68.     As for him personally, Glover explained to Felleman that, "if I had challenged something like that, they would not have allowed me to assume this position. If Joe had done that he would not have assumed his position….*[T]his stuff with the portal being wrong, I know it's being done wrong, it's not going to be something I'm going to argue with Josephine [Wang] about*….I even like Josephine only because I've know[n] her for so long **but I know she is not doing the right thing**…." (Emphasis added).

69.     Felleman told Glover that the "end result is a portal that doesn't work," and "**what a waste of time and energy on the part of so many people**," to which Glover added, "*And money*, well-being." Felleman said, "[w]hen you have testing, I'm supposed to do the testing. The testing

shows everything is wrong and they ignore it." Felleman noted to Glover, "[t]hey just dove in and didn't know what they were doing. They just kept digging a hole deeper and deeper." Glover responded that SIPC "management let them do that…There was nothing we could do about what the SIPC CEO [Wang] decided…was going to happen."

70.     Felleman replied to Glover, "They should have written up specs so we could talk about how it was going to be designed but they have no specs. Josephine has said they don't ever have to provide us with specs. How can that be? That a company that developed something for 4 years has nothing written down, to show us how they set it up? And that's how I would feel comfortable with the integrity of the system…I have no idea how it is set up. They are never going to write anything about how it is set up and all we can do…It's like a black box…We don't know what is happening in it. We just test it and the stuff that comes out is wrong."

71.     The day after this conversation, Glover told Felleman that everything which was discussed during their meeting the previous day should be kept confidential, and that she should not let the Portal Project get to her.

72.     During a dinner discussion with McIntosh on October 25, 2022, Felleman divulged that the investigation being conducted by Morgan Lewis was initiated because of her, Felleman. She further told McIntosh about the timeline of events and the individuals she mentioned by name in her September 1, 2022, letter to Slacik.

73.     Six days later, Felleman was admonished by SIPC General Counsel Michael Post and Morgan Lewis attorney Jocelyn Cuttino for discussing the investigation with McIntosh. During their conversation, Post defended Wang, saying he saw her as someone that wants input from others. Post told Felleman that besides himself, Sharma (who was assisting Wang in this

matter before Post joined SIPC), and Slacik, no one at SIPC knows that Felleman is the complainant.

74.     On November 14, 2022, during a conference call, Ferry noted that to do the overpayment activity report would require a tremendous amount of work for the legacy data. In saying this, Ferry basically acknowledged what Felleman had been saying for the past four years, that IT does not have the data they need to get the balances due by fiscal year end.

***The sham investigation which was initiated pursuant to Felleman's whistleblowing activities results in a no-finding of fraud, waste, abuse, or retaliation:***

75.     On November 17, 2022, Post and Slacik met with Felleman and provided her the results of the investigation they had conducted. According to Slacik, "the investigators did not find evidence of the big things that you suggested-fraud, waste, abuse and retaliation," but they found some things about the work environment "that we need to work on." Slacik said they found evidence that "people have not been treating each other civilly and we're taking action to correct that." Post added, "the chair and Board and the audit committee and outside counsel are all satisfied after a thorough investigation that there wasn't evidence" of fraud, waste, abuse, or retaliation. Felleman stated, "…I had so many things that I said in that letter, and I'm being given the answer that we found nothing," to which Slacik replied, "We did not find evidence to substantiate [fraud, waste, abuse, retaliation]." Felleman said in response, "I believe they exist and you did not find it maybe but I believe some of it still exists and I stand by what I said in that letter and how do you expect me to keep working, what you, you expect me to keep doing here given that I will be subject to retaliation and I'm in a hostile work environment? How do you expect me to continue?" Post responded that if she did not have a preference of either continuing to work on the project or being taken off the project, the expectation would be for her to continue working on the project and "do your normal job duties faithfully."

76.     On December 2, 2022, Felleman met with Wang. During their conversation, Felleman told Wang that she could not use the Portal, because as a CPA she could not rely on the data it provided. Felleman further explained that she had no confidence in the integrity of the data, and asked Wang what she wanted to 'do with her.' When Wang responded, "I don't know what you mean," Felleman explained, "I won't be able to use the portal. And I won't be able to do my job. What would you like me to do? My next step is to go the SEC."

77.     Wang then asked Felleman what was wrong with the Portal, and Felleman repeated to her consistent complaints that the brokers can get wrong numbers, and the interest is not calculated according to SIPA. When Felleman reminded Wang that she had put together a document showing how the interest is not calculated properly, Wang replied that SIPC's lawyers were working on it. When Felleman suggested that it would be appropriate to have a 'finance person' explain the details on why it doesn't work, Wang disagreed, saying, "the lawyers need to see it first." Felleman continued to tell Wang about other compounding issues, such as that SIPC's using outdated software (Windows 7 for example), and that Ferry was against her having information since day one of the Portal Project. In addition, Felleman expressed her concern to Wang that Glover had not been speaking to her, which made it hard to do her job, and she believed it was because he knew she is the whistleblower. Wang asked Felleman if she had asked why Glover was not speaking to her. Felleman said that Glover had told her that it was because she had failed to say hello one morning. Wang asked if that was what Glover had really said, and Felleman confirmed it. Wang claimed that she did not know until she had recently received a bill which identified Felleman as the whistleblower.

78.     Based on Felleman's comments, Wang asked her to present her concerns regarding the Portal to representatives of Peraton, the newly hired IT consultants who will be taking over the

project from InfernoRed after the Portal launch. This meeting was held without any other representatives from SIPC besides Felleman and Wang, at Felleman's request. She did not feel she could present this information in front of Glover and McIntosh, given their position that she was not allowed to discuss the deficiencies in the Portal.

79.    In her December 9, 2022, presentation to the Peraton representatives, Felleman listed eight causes for concern regarding the Portal Project which largely mirrored those she detailed in her September 1, 2022, letter to Slacik. In responding to these eight issues, Peraton representatives informed Felleman that the first three issues she had identified were beyond their control to address, and they would have to rely on SIPC to resolve those issues. The three issues beyond Peraton's control were:

    a.    Inconsistencies and errors in the Portal and report data. For example, the Portal shows that brokers can have different balances due, depending on where this information is obtained in the system.

    b.    SIPC's forms do not clearly and accurately reflect the assessment calculation. In some cases, brokers will not be able to figure out how the form reconciles to their payments and incurred assessments.

    c.    Interest is calculated in an incorrect manner that can be in violation of the SIPA.

80.    Given Peraton's assertion that it could not help resolve these issues, and Membership and Finance's inability to come to an agreement on these issues for three years (from 2019 through 2022), Felleman reasonably felt there was no forthcoming answer to this problem. Felleman left the meeting realizing that despite the possible improvement that replacing

27

InfernoRed may have on the Portal Project, the fundamental issues with the Project were not going to be resolved.

***Felleman has no choice but to resign from SIPC:***

81.     Being shut out of the communication channel and being prevented from providing essential information to SIPC's IT and InfernoRed regarding the Finance Department's requirements for the Portal; having her numerous concerns and complaints to senior SIPC management about being excised from this process go completely unanswered and ignored; having the concerns she raised to the very highest level of SIPC, Slacik, the Chair of the Board, about SIPC's violations of SIPA be swept under the rug by SIPC's General Counsel, its audit committee, and Morgan Lewis; having her be told repeatedly to keep quiet about the Portal Project and just do her job; having her be reminded by Glover that those people who speak up are treated poorly (citing specifically Mr. Wons); and being bound by strict ethical rules governing the conduct of CPAs and CFAs, Felleman had no choice but to resign on December 19, 2022.

82.     Under the AICPA, an accounting department is required to maintain a "segregation of duties" in the performance of each individual's duties. According to AICPA's website:

> Segregation of Duties (SOD) is a basic building block of sustainable risk management and internal controls for a business. The principle of SOD is based on shared responsibilities of a key process that disperses the critical functions of that process to more than one person or department. Without this separation in key processes, fraud and error risks are far less manageable.

> Imagine what would happen if the keys, lock, and code for a nuclear weapons system were all in the hands of one person! Emotions, coercion, blackmail, fraud, human error and disinformation could cause grave and expensive one-sided actions that can't be corrected. Or consider the software engineer who has the authority to move code into production without oversight, quality assurance or access rights' authentication.

> Without SOD, either of these scenarios clearly shows the possibility of disastrous outcomes. As a result, the risk management goal of SOD controls is to prevent

unilateral actions from occurring in key processes where irreversible affects are beyond an organization's tolerance for error or fraud.

83.     There was no segregation of duties when SIPC's IT Department, with the express approval and direction of Wang and implied approval of Glover, completely took over the Portal Project and excluded SIPC's Finance Department. *See* Compl. ¶¶ 34, 36, 41-45, 50-53, 56-57, 60, and 81. By refusing to share the responsibilities of developing the Portal with the Finance Department, the critical functions of developing the Portal were not able to be dispersed to more than one department. "Without this separation in key processes, fraud and error risks are far less manageable."

84.     The AICPA Code of Conduct provides the following in pertinent part:

2.000.020 Ethical Conflicts

.01 An ethical conflict arises when a member encounter one or both of the following:

    a.      Obstacles to following an appropriate course of action due to internal or external pressures

    b.      Conflicts in applying relevant professional and legal standards.

.06 If the ethical conflict remains unresolved, the member will in all likelihood be in violation of one or more rules if he or she remains associated with the matter creating the conflict. Accordingly, the member should consider his or her continuing relationship with the specific assignment or employer.

85.     The AICPA Code of Conduct further provides that a member, when responding to an organization's noncompliance with laws and regulations, must determine whether further action is necessary, which depends on various factors which include, but are not limited to:

    a.      The pervasiveness of the matter throughout the employing organization

  b.  Whether the member who is a senior professional accountant continues to have confidence in the integrity of the member's superiors and, if applicable, those charged with governance

  c.  Whether the noncompliance or suspected noncompliance is likely to reoccur

  d.  Whether there is credible evidence of actual or potential substantial harm to the interests of the employing organization, investors, creditors, employees, or the general public.

AICPA Code of Conduct, 2.180.010., 23.

86.  Under the AICPA Code of Conduct, "Further action" may include the following:

  a.  Informing the management of the parent entity of the matter if the employing organization is a member of a group

  b.  Resigning from the employing organization

  c.  Reporting the noncompliance or suspected noncompliance to an appropriate authority unless prohibited by laws or regulations

AICPA Code of Conduct, 2.180.010, .25.

87.  It was obvious to Felleman by December 2022 that SIPC had no intention whatsoever of remedying the problems with the Portal which she had brought repeatedly to the attention of SIPC's Officers and to the Chair of its Board. Even Glover, SIPC's Vice President of Finance, acknowledged the problems with the Portal which Felleman uncovered, but refused to go against SIPC's President and CEO, Wang, because he knew if he did so he would wind up being on the losing end of the confrontation.

88.  Because of the continued refusal by SIPC's Officers and the Chair of its Board to remedy these problems with the Portal—which had the potential to substantially harm its members, SIPC itself, and the general public--Felleman had no confidence in the integrity of its Officers or

Board, and she knew SIPC's noncompliance was very likely to reoccur—just as it had been for the prior three years.

89.     Accordingly, Felleman was compelled to take appropriate "further action" as defined in AICPA Code of Conduct 2.180.010, by resigning from SIPC.

90.     The CFA Institute Code of Ethics and Standards of Professional Conduct ("CFA Code") provides that its members "must abide by the [CFA Code] and are encouraged to notify their employer of this responsibility." Felleman's director supervisor, McIntosh, who is also a CFA and thus bound by the CFA Code, is presumably familiar with the CFA Code and the obligations it imposes on not only her, but also Felleman.

91.     The CFA Code imposes on its members responsibility for knowing the laws, rules, and regulations governing their professional activities. "*Members and Candidates must not knowingly participate or assist in and must dissociate from any violation of such laws, rules, or regulations.*" (Emphasis added).

92.     The CFA Code provides that its members "have a duty of loyalty to their clients and must act with reasonable care and exercise prudent judgment. *Members and candidates [for membership] must act for the benefit of their clients and place their clients' interests before their employer's or their own interests.*" (Emphasis added).

93.     As a member bound the CFA Code, Felleman is required to "[a]ct with integrity, competence, diligence, respect, and in an ethical manner with the public, clients, prospective clients, employers, employees, colleagues in the investment profession, and other participants in the global capital markets."

94.     SIPC was requiring Felleman to ignore the problems she was aware of with the Portal, which she knew directly impacted SIPC's clients (the member broker/dealers). Felleman

knew that if she continued working for SIPC, she would have violated the AICPA and the CFA Code.

95.     Felleman, following what the CFA Code required her to do, put the interests of SIPC's members ahead of her own and ahead of SIPC, and dissociated herself from SIPC because SIPC refused to listen to Felleman and rectify the problems with the Portal she had identified.

96.     Violations of the CFA Code "may result in disciplinary sanctions by the CFA Institute. Sanctions can include revocation of membership, revocation of candidacy in the CFA Program, and revocation of the right to use the CFA designation."

97.     If Felleman had not dissociated herself from SIPC by resigning, she would have violated the CFA Code, which may have resulted in her losing her CFA designation—which would have decimated her career in the finance industry.

98.     Due to SIPC's refusal to act to correct the errors with the Portal, on December 19, 2022, Felleman notified Glover in writing that she was resigning her position at SIPC, and that her last day of work will be December 30, 2022.

99.     On December 20, 2022, Glover accepted Felleman's resignation, stating in writing, "Thank you for your service to SIPC, we wish you all the best in the years ahead."

**COUNT I**
**BREACH OF FIDUCIARY DUTIES AGAINST DEFENDANT SIPC**
**THROUGH CLAUDIA SLACIK ACTING SOLELY ON BEHALF OF SIPC**

100.     Plaintiff realleges and incorporates Paragraphs 1-13 and 25-99 as if fully set forth herein.

101.     A fiduciary relationship exists where the relationship is "founded upon trust or confidence reposed by one person in the integrity and fidelity of another…The rule embraces both technical fiduciary relations and those informal relations which exist *whenever one man trusts in,*

*and relies upon, another….*" *Church of Scientology, Int'l v. Eli Lilly & Co.,* 848 F. Supp. 1018,

1028 (D.D.C. 1994) (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 325 (S.D.N.Y. 1991) (internal

citations omitted) (Emphasis added).

102.    A "fiduciary relation exists when one party 'is under a duty to act for or give advice

for the benefit of another upon matters within the scope of the relation.'" *Church of Scientology,*

848 F. Supp. at 1028 (quoting Restatement (Second) of Torts § 874, *comment a).*

103.    Where the officers or directors of an organization act entirely within the scope of

their employment and not in any personal or individual capacity, it is the organization itself which

owes a fiduciary duty to the plaintiff/employee. *Paul v. Judicial Watch, Inc.,* 543 F. Supp.2d 1 at

*6 (D.D.C. Feb. 6, 2008).

104.    To state a claim for breach of fiduciary duty, a plaintiff must allege facts sufficient

to establish the following: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached

that duty; and (3) to the extent plaintiff seeks compensatory damages—the breach proximately

caused an injury. *Judicial Watch, Inc.,* 543 F. Supp.2d at *5-6.

105.    Slacik became Chair of SIPC's Board of Director in early 2022. In that role, Slacik

had a duty to act:

> "(1) In good faith; and
>
> (2) In a manner the director reasonably believes to be in the interests of the
>
> nonprofit corporation;" and
>
> (3) To discharge her duties "with the care that a person in a like position would
>
> reasonably believe appropriate under similar circumstances." D.C. Code § 29-
>
> 406.30(a)(1),(2), (b).

106.    When Felleman approached Slacik with her concerns about the problems with the functioning of the Portal, its mismanagement, possible instances of conflict of interest, fraud, waste, and abuse, *see* Compl. *supra* ¶¶ 6-7, 9, 58-60, 81, she did so trusting in Slacik's advice and integrity and expecting Slacik to carry out her duty to act in the best interests of SIPC.

107.    What was in the best interests of SIPC mirrored the best interests of Felleman. As SIPC's Manager - Investments, responsible for managing an annual portfolio of $4 billion in Treasury Securities, Felleman had a special interest in ensuring that SIPC was financially operating in a manner that would protect the interests of its member broker-dealers.

108.    All amounts received by SIPC's member broker-dealers went into the SIPC fund, and "all expenditures made by SIPC shall be made out of the fund." 15 U.S.C. § 78ddd(a)(1). The assessments paid by SIPC's member broker-dealers comprise a large percentage of SIPC's fund. *See* 15 U.S.C. § 78ddd(c)(1).

109.    Felleman reported to Slacik improprieties she discovered about how member broker-dealer's assessments were being calculated. She reported to Slacik gross improprieties in SIPC's large payments to InfernoRed, with no or little usable product received: "There are no cost limitations in the contract and statement of work with InfernoRed. SIPC has paid InfernoRed $3.8 million for the project thus far for work through July 2022, at an average cost of $131,000 per month thus far in 2022. ***The earliest that management is projecting completion of the project is December 2022, at which time the total cost of the project would likely be $4.4 million.***" (Emphasis added). Everything that Felleman reported to Slacik about the Portal directly impacted Felleman's ability to perform her role as SIPC's Manager - Investments. *See* Compl. *supra* ¶¶ 58-60.

110.    In Felleman's September 2022 letter to Slacik, detailing the Portal's mismanagement, dysfunction, possible instances of conflict of interest, fraud, waste, and abuse, she concluded by imploring Slacik to help her, writing, "I am hopeful that you and the Board will take action to improve this situation for the benefit of SIPC, and for my personal well-being." *See* Compl. *supra* ¶ 60. Felleman explicitly told Slacik, that, "[a]s a CPA and a CFA, I operate under a code of professional ethics. It is my duty to report suspected fraud, and I take this responsibility seriously."

111.    Felleman's September 2022 letter to Slacik unequivocally demonstrates the trust and confidence she placed in Slacik to take appropriate action in response to her concerns about the Portal project, and to ensure that SIPC would not require Felleman to violate her professional codes of ethics (i.e., "for my personal well-being").

112.    Because Felleman's relationship with Slacik (in Slacik's official capacity as Chair of SIPC's Board) was one founded on trust and confidence, SIPC owed Felleman a fiduciary duty.

113.    SIPC, through Slacik acting in her official capacity as Chair of SIPC's Board, breached that duty when Slacik failed to take any action in response to Felleman's September 2022 letter and when she rubber-stamped the sham "investigation" done in response to Felleman's complaints. During Slacik's and Post's post-investigation conversation with Felleman on November 17, 2022, Slacik told Felleman, "the investigators did not find evidence of the big things that you suggested-fraud, waste, abuse and retaliation," but they found some things about the work environment "that we need to work on." Slacik said they found evidence that "people have not been treating each other civilly and we're taking action to correct that." *See* Compl. *supra* ¶ 75.

114.    Felleman had a reasonable expectation that Slacik would respond in good faith and in a manner that would be in the best interests of SIPC, as Slacik is required to do per D.C. Code

§ 29-406.30(a)(1),(2),  and in a manner that would not require Felleman to violate her professional codes of ethics.

115.     When Felleman responded to Slacik and Post, asking in disbelief how she was supposed to do her job, Post summarily replied that if she did not have a preference of either continuing to work on the project or being taken off the project, the expectation would be for her to continue working on the project and "do your normal job duties faithfully." Slacik did not provide Felleman with any other options.

116.     Slacik failed to meet Felleman's expectation that she would act in the best interest of SIPC and that she would take action to ensure that Felleman could perform her role as SIPC's Manager - Investments without running afoul of her professional and ethical obligations as a CPA and CFA.

117.     By failing to meet these expectations that Felleman had of Slacik through the trust and confidence she had placed in her, SIPC (through Slacik, the Chair of SIPC's Board), violated its fiduciary duty to Felleman. *See Church of Scientology Int'l*, 848 F. Supp. at 1028, finding:

> "there is adequate evidence in the record to support CSI's claim that its relationship with H & K was one of great sensitivity, based on trust and confidence and that H & K breached the relationship that had been established. Particularly, there is evidence that H & K betrayed this trust by compromising its representation of CSI for the benefit of WPP's bottom line, and by giving advice to others to be specifically used against CSI's interests."

Slacik betrayed the trust that Felleman had placed in her by summarily dismissing her concerns about the Portal Project and requiring her to make the Hobson's Choice of either continue working on the Portal (and thereby violate her professional codes of ethics) or resign.

118.     SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits,

compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

**COUNT II**
**BREACH OF FIDUCIARY DUTIES AGAINST DEFENDANT SIPC**
**THROUGH JOSEPHINE WANG ACTING SOLELY ON BEHALF OF SIPC**

119.    Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

120.    Wang, at all times relevant to the allegations herein, was SIPC's Chief Executive Officer.

121.    As SIPC's Chief Executive Officer with discretionary authority, Wang had the duty to discharge her duties in that role: "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the officer reasonably believes to be in the best interest of the corporation." D.C. Code § 29-406.42(a)(1),(2),(3).

122.    What was in the best interests of SIPC mirrored the best interests of Felleman. As SIPC's Manager - Investments, responsible for managing an annual portfolio of $4 billion in Treasury Securities, Felleman had a special interest in ensuring that SIPC was financially operating in a manner that would protect the interests of its member broker-dealers.

123.    Felleman had the reasonable expectation that Wang, as SIPC's CEO, would act in the best interests of SIPC, as Wang is required to do under D.C. Code § 29-406.42(a)(1),(2),(3)-- and in a manner that would not require Felleman to violate her professional codes of ethics.

124.    All amounts received by SIPC's member broker-dealers went into the SIPC fund, and "all expenditures made by SIPC shall be made out of the fund." 15 U.S.C. § 78ddd(a)(1).

125.    Instead of acting in the best interests of SIPC, and hence, Felleman, Wang acted in a manner that an ordinarily prudent person would not, thereby hurting SIPC's interests (and hence,

Felleman's), and causing Felleman to violate her professional codes of ethics if Felleman continued to work for SIPC:

   a.     Wang approved and signed on behalf of SIPC a Consulting Agreement and the September 2019 SOW—neither of which contained any caps as to the fees which InfernoRed could charge SIPC, nor did either document break down the work to be done into project phases. *See* Compl. *supra* ¶ 33;

   b.     In April 2020, Felleman made Wang aware that the Finance Department (and therefore Felleman) was being denied access to the database. Wang responded by granting the Finance Department access, but that access was short-lived, lasting only a couple of months. *See* Compl. *supra* ¶ 36;

   c.     In December 2020, Wang took swift action against Wons, who dared confront Wang about the problems with the InfernoRed contract by removing him from the Portal project. *See* Compl. *supra* ¶¶ 46-47;

   d.     On December 21, 2020, Wang emailed Wons and members of the Finance Department and copied Saperstein, Kenneth Caputo (SIPC's General Counsel at that time), Glover, Ferry, and Bailey, informing them that, going forward, communications with the developers were being streamlined, "so that answers that the developers need, are provided with much specificity, and the developers can move forward quickly in their work." ***The basis for this change, Wang stated, was because "the [Portal] project [they had been working on for over a year] is over budget and behind schedule. It is clear that we underestimated the magnitude of the project.***" (Emphasis added).

e.      Per Wang's December 21, 2020, email, SIPC's non-IT staff members could only bring their questions about the Portal to their respective Department Heads, and IT staff members could only bring their questions to Ferry. Wang further prohibited direct communications between non-IT staff members and IT unless such communications were being conducted in a formal meeting or pursuant to permission granted by either the non-IT staff member's Department Head or Ferry.

f.      Wang made official the communication restrictions in the December 2020 SOW she signed with InfernoRed. The December 2020 SOW stipulated that SIPC would assign Ferry as the point of contact between SIPC and InfernoRed for the duration of the December 2020 SOW (June 30, 2021, was the specified termination date), and further, that no member of SIPC staff could communicate directly with InfernoRed, and no member of InfernoRed could communicate with SIPC staff "outside of a formal meeting" or without the permission of SIPC's Department Heads or Ferry.

g.      By preventing Felleman and the Finance Department from being able to communicate directly with either Ferry or InfernoRed (unless in a formal meeting or with permission), Wang made the imprudent decision to ensure that the Portal project would be developed and implemented without any input from Felleman or the Finance Department as to the accuracy of the numbers being produced in the Portal.

h.      Despite this lack of intrusion by the Finance Department into the decision-making process of creating the Portal, the Portal Project was not completed by January 31, 2021. Apparently, the "streamlined communications" dictated by Wang

in December 2020 were not enough to complete the Portal Project by January 31, 2021. In fact, as of the date of filing the instant Complaint—nearly four years after SIPC and InfernoRed entered into the Consulting Agreement and September 2019 SOW--the Portal Project is still under development.

i.      Wang permitted the Portal project to operate "without…fundamental project management features including timelines, specific milestones, testing plans, and…written specifications. There are no cost limitations in the contract and statement of work with InfernoRed. SIPC has paid InfernoRed $3.8 million for the project thus far for work through July 2022, at an average cost of $131,000 per month thus far in 2022. ***The earliest that management is projecting completion of the project is December 2022, at which time the total cost of the project would likely be $4.4 million.***"  Felleman's September 2022 letter to Slacik (Emphasis added).

j.      Wang also permitted ***InfernoRed to be brought on "without an open selection process, under a contract that was signed less than a month after IT was awarded the project." As of September 2022, "the $3.8 million cost of the project is many times higher than the total cost presented by several of the other software developer proposals considered and is about the same as a proposal by FINRA which was deemed at the time as prohibitively high***." *Id.*  (Emphasis added).

126.    On December 2, 2022, Felleman met with Wang. During their conversation, Felleman told Wang that she could not use the Portal, because as a CPA she could not rely on the data it provided. Felleman further explained that she had no confidence in the integrity of the data,

and asked Wang what she wanted to 'do with her.' When Wang responded, "I don't know what you mean," Felleman explained, "I won't be able to use the portal. And I won't be able to do my job. What would you like me to do? My next step is to go the SEC."

127.    Wang then asked Felleman what was wrong with the Portal, and Felleman repeated her consistent complaints that the brokers can get wrong numbers, and the interest is not calculated according to SIPA. When Felleman reminded Wang that she had put together a document showing how the interest is not calculated properly, Wang replied that SIPC's lawyers were working on it. When Felleman suggested that it would be appropriate to have a 'finance person' explain the details on why it does not work, Wang disagreed, saying, "the lawyers need to see it first." Felleman continued to tell Wang about other compounding issues, such as that SIPC's using outdated software (Windows 7 for example), and that Ferry was against her having information since day one of the Portal Project. In addition, Felleman expressed her concern to Wang that Glover had not been speaking to her, which made it hard to do her job, and she believed it was because he knew she is the whistleblower. Wang asked Felleman if she had asked why Glover was not speaking to her. Felleman said that Glover had told her that it was because she had failed to say hello one morning. Wang asked if that was what Glover had really said, and Felleman confirmed it. Wang claimed that she did not know until she had recently received a bill which identified Felleman as the whistleblower.

128.    Based on Felleman's comments, Wang asked her to present her concerns regarding the Portal to representatives of Peraton, the newly hired IT consultants who will be taking over the project from InfernoRed after the Portal launch. This meeting was held without any other representatives from SIPC besides Felleman and Wang, at Felleman's request. She did not feel she

could present this information in front of Glover and McIntosh, given their position that she was not allowed to discuss the deficiencies in the Portal.

129.    In her December 9, 2022, presentation to the Peraton representatives, Felleman listed eight causes for concern regarding the Portal Project which largely mirrored those she detailed in her September 1, 2022, letter to Slacik. In responding to these eight issues, Peraton representatives informed Felleman that the first three issues she had identified were beyond their control to address, and they would have to rely on SIPC to resolve those issues. The three issues beyond Peraton's control were:

a.    Inconsistencies and errors in the Portal and report data. For example, the Portal shows that brokers can have different balances due, depending on where this information is obtained in the system.

b.    SIPC's forms do not clearly and accurately reflect the assessment calculation. In some cases, brokers will not be able to figure out how the form reconciles to their payments and incurred assessments.

c.    Interest is calculated in an incorrect manner that can be in violation of the SIPA.

130.    During Felleman's December 2, 2022, conversation with Wang, Felleman made Wang aware that she could not perform her job as a CPA if the problems with the Portal were not fixed and expressly asked for Wang to explain what she wanted Felleman to do. Felleman's imploring Wang for assistance and direction exemplifies the trust and confidence Felleman had placed in Wang to properly carry out her duties as SIPC's CEO by protecting SIPC's interests, and thereby her interests, and to ensure that SIPC would not require Felleman to violate her professional codes of ethics. *See* Compl. *supra* ¶¶ 126-127.

131. Wang was present during Felleman's December 9, 2022, presentation to Peraton, the new contractor on the Portal, in which Felleman outlined the problems with the Portal. *See* Compl. *supra* ¶¶ 128-129. Wang heard the Peraton representatives tell Felleman that they would not be able to fix three issues with the Portal, one of which were the inconsistencies and errors in the Portal and report data.

132. Notwithstanding knowing that Peraton could not fix three major issues with the Portal—all of which directly impacted Felleman's ability to perform her role as the Manager - Investments—and knowing that Felleman could not perform that role if those problems were not addressed because doing so would cause her to violate her ethical and professional obligations as a CPA and CFA—Wang did nothing.

133. Felleman had a reasonable expectation that Wang, as SIPC's CEO, would respond in good faith and in a manner that would be in the best interests of SIPC, as Wang is required to do per D.C. Code § 29-406.42(a)(1),(2),(3), and in a manner that would not require Felleman to violate her professional codes of ethics.

134. By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Wang violated the trust and confidence that Felleman had placed in her.

135. By violating the trust and confidence that Felleman had placed in Wang, SIPC (through Wang, SIPC's Chief Executive Officer) violated its fiduciary duty to Felleman. *See Church of Scientology Int'l*, 848 F. Supp. at 1028.

136. SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits,

compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

### COUNT III
### BREACH OF FIDUCIARY DUTIES AGAINST DEFENDANT SIPC
### THROUGH CHARLES GLOVER ACTING SOLELY ON BEHALF OF SIPC

137.   Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

138.   Glover, at all times relevant to the allegations herein, was SIPC's Vice President of Finance. In that role, Glover was also Felleman's second-line supervisor.

139.   As SIPC's Vice President of Finance and an Officer of SIPC, Glover had the duty to discharge his duties in that role: "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the officer reasonably believes to be in the best interest of the corporation." D.C. Code § 29-406.42(a)(1),(2),(3).

140.   What was in the best interests of SIPC mirrored the best interests of Felleman. As SIPC's Manager - Investments, responsible for managing an annual portfolio of $4 billion in Treasury Securities, Felleman had a special interest in ensuring that SIPC was financially operating in a manner that would protect the interests of its member broker-dealers.

141.   Felleman had the reasonable expectation that Glover, as SIPC's Vice President of Finance and her second-line supervisor, would act in the best interests of SIPC, and in a manner that would not require Felleman to violate her professional codes of ethics.

142.   All amounts received by SIPC's member broker-dealers went into the SIPC fund, and "all expenditures made by SIPC shall be made out of the fund." 15 U.S.C. § 78ddd(a)(1).

143.     Instead of acting in the best interests of SIPC, and hence, Felleman, Glover acted in a manner that an ordinarily prudent person would not, thereby hurting SIPC's interests (and hence, Felleman's), and causing Felleman to violate her professional codes of ethics if Felleman continued to work for SIPC:

a.     Felleman made Glover aware, through her emails dated May 14, 2020, and May 22, 2020 (on which he was copied), of significant issues she had identified with the Portal project which directly impacted SIPC and its members. *See* Compl. *supra* ¶¶ 38-42.

b.     In her May 14, 2020, and May 22, 2020, emails, Felleman also explained how several of the Finance Department's denied requests for the project plan directly impact SIPC. For example, in Felleman's May 22, 2020, email reply to Bailey, she expressed concerns about SIPC's ability to retrieve data as of a specific date, because retrieval was reliant on a time stamp for when each item was stored in the database. Felleman explained that, "[t]he ability to do this is destroyed when data can be changed in the database rather than being updated…You would not go in and change what was already entered in the database. This way, you are not losing any information, and you have a record of what was changed and when. ***Since this is our official record of our revenue, data cannot be[] changed without a record."*** Emphasis added.

c.     In Felleman's May 22, 2020, email reply to Bailey, she explained the importance and need for the Finance Department to have input into how the data fields were being set up in the Portal: "I was not referring here to an after the fact documentation of what the fields that were set up in the database. *Since the new calculations for overpayments and interest are complicated, I think there is a need for all stakeholders to*

*review the new fields and method of calculation for these prior to implementation*." (Emphasis added).

d.       On May 29, 2020, Bailey emailed Felleman, saying, "[s]ince the form submission process is almost complete, it has been verified that data is being captured." Felleman replied to Bailey via email that same day (and copied Wons, McIntosh, Young, and Glover), saying, "it seems that you will not be including these items in the project plan that is due to be provided to SIPC on Monday. I am unclear as to why these items cannot be added."

e.       On June 28, 2020, Felleman emailed Tibbs (and copied McIntosh, Glover, and Young), reminding her that the numerous requests made by the Portal Finance Committee for the Portal had been ignored since September 2019. While Tibbs had previously responded that these items would be investigated and/or discussed with the Portal Finance Committee, no such action had been taken. Felleman plainly told Tibbs, "it is unfortunate that so much time has been **wasted** by ignoring our concerns." (Emphasis added).

f.       On July 3, 2020, Felleman reached out to McIntosh, Glover, and Young, once again expressing her frustration with Tibbs's failure to respond to the Portal Finance Committee's legitimate concerns about the Portal. Felleman informed them that Tibbs's "comments show a continued effort to ignore or stall the implementation of our requests."

g.       On December 21, 2020, Wang emailed Wons and members of the Finance Department and copied Saperstein, Kenneth Caputo (SIPC's General Counsel at that time), Glover, Ferry, and Bailey, informing them that, going forward, communications with the developers were being streamlined, "so that answers that the developers need, are provided

with much specificity, and the developers can move forward quickly in their work." ***The basis for this change, Wang stated, was because "the [Portal] project [they had been working on for over a year] is over budget and behind schedule. It is clear that we underestimated the magnitude of the project.***" (Emphasis added).

        h.      Per Wang's December 21, 2020, email (on which Glover was copied), SIPC's non-IT staff members could only bring their questions about the Portal to their respective Department Heads, and IT staff members could only bring their questions to Ferry. Wang further prohibited direct communications between non-IT staff members and IT unless such communications were being conducted in a formal meeting or pursuant to permission granted by either the non-IT staff member's Department Head or Ferry.

144.     Despite his responsibility as SIPC's Vice President of Finance to take action to address the problems which Felleman raised about the Portal's producing inaccurate information, Glover remained silent.

145.     On or around March 24, 2022, Glover was informed by Saperstein of a conversation which she and Felleman had regarding the wording in Slacik's Letter to the Chair of the SEC in SIPC's 2021 Annual Report, which implied the Portal was going to facilitate processing on the back end for the Finance Department. Felleman had told Saperstein that the Finance Portal Committee had requested improvements which would permit greater accessibility and usability, but their requests had been denied. As a result, Felleman explained, the Finance Department was not expecting any improvements in their processing on the back end, and they were just hoping they (the Finance Department) could continue to do their jobs.

146.     Immediately after their conversation, Saperstein informed Glover of what Felleman told her. Glover then contacted Felleman and admonished her for saying what she did to Saperstein.

147.     He also told Felleman that because of Wang's nature, they could not disagree with her. Upset by what Glover was telling her, Felleman expressed she was very unhappy about the way she had been treated on the Portal Project. Felleman asked Glover if she could be removed from the Portal Project, which request he denied. She told him that the Portal Project was making her shake, and that she had gone to a doctor about the stress levels she was experiencing at work. Glover said that because Felleman is the Investment Manager, she must stay on the Portal Project. Dismissing the entirety of her concerns, Glover condescendingly suggested to Felleman that she not get upset about the Portal Project and not take it personally.

148.     On or around October 7, 2022, Glover and Felleman talked about their not communicating with one another since July 2022. Glover said he knew that Felleman was upset about the Portal Project. Glover explained that he had been at SIPC a long time—37 years-- and he knows its culture: that Finance does whatever Operations and the CEO want done. Glover said, "I know there is more to a job than that [salary] but we have constraints at SIPC because of management. I mean, as I said, we can fight, we can argue, do all this stuff ***but all it's going to do is hurt the person who is you know challenging what they want to do***." Glover continued by saying he thinks the Portal Project has taken "its toll" on Felleman. Referring to the Finance Department's expressed concerns about the Portal Project, he said that, "it's not going to change the way they are doing things." Glover admitted that because of the silence which was forced upon him, "It's been disheartening for me for decades...I've had some awful moments at SIPC." Glover told Felleman about a former employee, Pat Kennedy, who, despite his insistence that she stay at SIPC, resigned because "she couldn't be here anymore…[i]t was more than she could take."

149.     Glover also, however, admonished Felleman, telling her that: "we just don't want to hold up the project by going over the same thing again and again and again. When they are not

being receptive. You can't force them to be receptive. No matter what you do. I've had issues here myself and it's been painful, there have been some painful years here but I did learn to move on…I wish I could say that somehow I wish there is going to be an epiphany with the portal team but there is not going to be an epiphany and they are not going to suddenly wake up and say oh wow she's [Felleman] right.

150.    When Glover asked Felleman what her options were, she replied, "leaving [SIPC] apparently." When he asked her about her options for remaining at SIPC, she said, "it doesn't sound like there are any." She continued, "It's not something that I look for in a job where I am kind of shut down…I just have to figure out what to do." Felleman reiterated her concerns to Glover about the system being used in the Portal, saying, "We have a very poorly guarded system, the integrity of the data, the integrity of the numbers—it's all suspect given the IT that we have and it carries through to everything."

151.    Glover talked to Felleman about Abe Wons' former involvement in the Portal Project, and why his involvement was stopped: "this is Abe talking and being very forceful in his argument about the deficiencies about InfernoRed you know, and he gets removed…They don't want to hear it…He was being disrespected as well when he made arguments about InfernoRed." When Felleman said in response she did not understand why this had continued to exist for 30 years, Glover replied, "Because Legal runs everything and this company and it has gotten worse."

152.    Glover proceeded to tell Felleman that in his experience with SIPC, he observed the following when SIPC hired an outside consultant or investigator to look into concerns that had been raised: "they [the outside consultant or investigator] side with the person who hires them or pays them [SIPC] and they want to get the next gig from the company….They seldom want to bite the hand that feeds them. That is my sense of things."

153.    As for him personally, Glover explained to Felleman that, "if I had challenged something like that they would not have allowed me to assume this position. If Joe had done that he would not have assumed his position….***[T]his stuff with the portal being wrong, I know it's being done wrong, it's not going to be something I'm going to argue with Josephine [Wang] about***….I even like Josephine only because I've know[n] her for so long ***but I know she is not doing the right thing***…." (Emphasis added).

154.    Felleman told Glover that the "end result is a portal that doesn't work," and "***what a waste of time and energy on the part of so many people***," to which Glover added, "***And money***, well-being." Felleman said, "[w]hen you have testing, I'm supposed to do the testing. The testing shows everything is wrong and they ignore it." Felleman noted to Glover, "[t]hey just dove in and didn't know what they were doing. They just kept digging a hole deeper and deeper." Glover responded that SIPC "management let them do that…There was nothing we could do about what the SIPC CEO [Wang] decided…was going to happen."

155.    Felleman replied to Glover, "They should have written up specs so we could talk about how it was going to be designed but they have no specs. Josephine has said they don't ever have to provide us with specs. How can that be? That a company that developed something for 4 years has nothing written down, to show us how they set it up? And that's how I would feel comfortable with the integrity of the system…I have no idea how it is set up. They are never going to write anything about how it is set up and all we can do…It's like a black box…We don't know what is happening in it. We just test it and the stuff that comes out is wrong."

156.    The day after this conversation, Glover told Felleman that everything which was discussed during their meeting the previous day should be kept confidential, and that she should not let the Portal Project get to her.

157.     In Felleman's communications with Glover, *see* Compl. *supra* ¶¶ 43-48, 143a-h, 146-156, Felleman approached Glover with trust and confidence, and with the expectation that he, as SIPC's Vice President of Finance and her second-level supervisor, would respond to her grave concerns about the reliability and functionality of the Portal with appropriate action to rectify the problems she pointed out. She also trusted Glover that, since he knew she could not perform her role as Manager - Investments without violating her ethical and professional obligations if the problems were not fixed, he would take action to ensure those problems were fixed so that she could continue performing her role that was so vital to SIPC.

158.     Glover violated the trust and confidence which Felleman had placed in him by:

● Downplaying her concerns, telling Felleman to "not take it personally";

● Refusing her request to be removed from the Portal project—even though she had told Glover that the Portal Project was making her shake, and that she had gone to a doctor about the stress levels she was experiencing at work;

● Intimidating her by telling her that Finance does whatever Operations and the CEO (Wang) want done and that, "we have constraints at SIPC because of management. I mean, as I said, we can fight, we can argue, do all this stuff *but all it's going to do is hurt the person who is you know challenging what they want to do*.";

● Essentially directing Felleman to stop questioning IT's and Wang's running of the Portal Project by telling her, "we just don't want to hold up the project by going over the same thing again and again and again. When they are not being receptive. You can't force them to be receptive. No matter what you do.";

● Reminding Felleman of the dire consequences of speaking out against the Portal Project by telling her why Wons' involvement in the Portal Project was stopped:

"this is Abe talking and being very forceful in his argument about the deficiencies about InfernoRed you know, and he gets removed…They don't want to hear it…He was being disrespected as well when he made arguments about InfernoRed."

- Burying his head and refusing to do anything to fix the problems with the Portal which Felleman had brought to his attention, telling Felleman, "*[T]his stuff with the portal being wrong, I know it's being done wrong, it's not going to be something I'm going to argue with Josephine [Wang] about*…I even like Josephine only because I've know[n] her for so long *but I know she is not doing the right thing*…." (Emphasis added).

- Acknowledging to Felleman that the Portal Project was a waste of money and well-being—yet refusing to do anything about it-- knowing as he did, that Felleman, as SIPC's Manager - Investments, was responsible for revealing inappropriate and incorrect transactions.

159.   Felleman had a reasonable expectation that Glover, as SIPC's Vice President of Finance, would respond in good faith and in a manner that would be in the best interest of SIPC (and hence, Felleman's best interests), as Glover is required to do per D.C. Code § 29-406.42(a)(1),(2),(3), and in a manner that would not require Felleman to violate her professional codes of ethics.

160.   By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Glover violated the trust and confidence that Felleman had placed in him.

161.   By violating the trust and confidence that Felleman had placed in Glover, SIPC (through Glover, SIPC's Vice President of Finance), violated its fiduciary duty to Felleman. *See Church of Scientology Int'l*, 848 F. Supp. at 1028.

162.    SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

### COUNT IV
**BREACH OF FIDUCIARY DUTIES AGAINST DEFENDANT SIPC
THROUGH KAREN SAPERSTEIN ACTING SOLELY ON BEHALF OF SIPC**

163.    Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

164.    Saperstein, at all times relevant to the allegations herein, was SIPC's Vice President of Operations.

165.    As SIPC's Vice President of Operations and an Officer of SIPC, Saperstein had the duty to discharge her duties in that role: "(1) In good faith; (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) In a manner the officer reasonably believes to be in the best interest of the corporation." D.C. Code § 29-406.42(a)(1),(2),(3).

166.    What was in the best interests of SIPC mirrored the best interests of Felleman. As SIPC's Manager - Investments, responsible for managing an annual portfolio of $4 billion in Treasury Securities, Felleman had a special interest in ensuring that SIPC was financially operating in a manner that would protect the interests of its member broker-dealers.

167.    Felleman had the reasonable expectation that Saperstein, as SIPC's Vice President of Operations, would act in the best interests of SIPC, and in a manner that would not require Felleman to violate her professional codes of ethics.

168.    All amounts received by SIPC's member broker-dealers went into the SIPC fund, and "all expenditures made by SIPC shall be made out of the fund." 15 U.S.C. § 78ddd(a)(1).

169.    Instead of acting in the best interests of SIPC, and hence, Felleman, Saperstein acted in a manner that an ordinarily prudent person would not, thereby hurting SIPC's interests (and hence, Felleman's), and causing Felleman to violate her professional codes of ethics if Felleman continued to work for SIPC:

      a.    On December 21, 2020, Saperstein was informed by Wang via an email on which Saperstein was copied that Wang was streamlining communications between SIPC and InfernoRed because, ***"the [Portal] project [they had been working on for over a year] is over budget and behind schedule. It is clear that we underestimated the magnitude of the project.***" (Emphasis added).

      b.    Saperstein was also aware, through Wang's December 21, 2020, email on which she was copied that Wang prohibited direct communications between non-IT staff members and IT unless such communications were being conducted in a formal meeting or pursuant to permission granted by either the non-IT staff member's Department Head or Ferry.

      c.    On or around March 24, 2022, Saperstein informed Glover of a conversation which she and Felleman had regarding the wording in Slacik's Letter to the Chair of the SEC in SIPC's 2021 Annual Report, which implied the Portal was going to facilitate processing on the back end for the Finance Department. Felleman had told Saperstein that the Finance Portal Committee had requested improvements which would permit greater accessibility and usability, but their requests had been denied. As a result, Felleman explained, the Finance Department was not expecting any improvements in their

processing on the back end, and they were just hoping they (the Finance Department) could continue to do their jobs.

       d.      Immediately after their conversation, Saperstein informed Glover of what Felleman told her.  Glover then contacted Felleman and admonished her for saying what she did to Saperstein.

       e.      Saperstein told Felleman that she needed to 'cheer up' when Felleman told her about how poorly Ferry was treating her and dismissing her concerns.

170.    Felleman had told Saperstein about the personal toll the Portal Project was taking on her.

171.    In Felleman's communications with Saperstein, *see* Compl. *supra* ¶¶ 169c-e, 170, Felleman approached Saperstein with trust and confidence, and with the expectation that she, as SIPC's Vice President of Operations, would respond to her grave concerns about the reliability and functionality of the Portal with appropriate action to rectify the problems she pointed out.

172.    Felleman also trusted Saperstein that, since she knew the personal toll the Portal Project was taking on her and her inability to continue working on the Portal if the problems were not fixed because doing so would violate Felleman's ethical and professional obligations, Saperstein would take action to ensure those problems were fixed so that she could continue performing her role that was so vital to SIPC.

173.    Saperstein violated the trust and confidence which Felleman had placed in her by:

     ●     Refusing to take action when she was informed in December 2020 that the Portal Project was already at that point over budget and behind schedule—knowing as she did, that Felleman, as SIPC's Manager - Investments, was responsible for was responsible for revealing inappropriate and incorrect transactions.

●       Refusing to take action when she was informed that the Finance Department was being prevented from having any direct communications with IT or InfernoRed—which she knew was creating inaccurate data going into and out of the Portal that, in turn, impacted Felleman's ability to perform her role as SIPC's Manager - Investments;

●       Refusing to take action after Felleman informed her that the Finance Department would not be able to make any processing changes on the back-end—which was contrary to Slacik's Letter to the SEC—because the Finance Department had been excised from the Portal Project; and

●       Refusing to take action after Felleman informed her that the Portal Project was taking a personal toll on Felleman and that Felleman could not perform her role at SIPC without violating her ethical and professional obligations if the problems with the Portal project were not fixed.

174.    Felleman had a reasonable expectation that Saperstein, as SIPC's Vice President of Operations, would respond in good faith and in a manner that would be in the best interest of SIPC (and hence, Felleman's best interests), as Saperstein is required to do per D.C. Code § 29-406.42(a)(1),(2),(3), and in a manner that would not require Felleman to violate her professional codes of ethics.

175.    By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Saperstein violated the trust and confidence that Felleman had placed in her.

176.    By violating the trust and confidence that Felleman had placed in Saperstein, SIPC (through Saperstein, SIPC's Vice President of Operations), violated its fiduciary duty to Felleman. *See Church of Scientology Int'l*, 848 F. Supp. at 1028.

177.    SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

**COUNT V**
**COMMON LAW NEGLIGENCE**
**AGAINST DEFENDANT SIPC**

178.    Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

179.    A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

180.    Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

181.    The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

182.    Felleman was employed by SIPC to perform duties that required Felleman to adhere to the AICPA Code of Professional Conduct as well as the CFA Institute Code of Ethics and Standards of Professional Conduct.

183.    SIPC was aware of Felleman's obligation to follow the AICPA Code of Professional Conduct and the CFA Institute Code of Ethics and Standards of Professional Conduct.

184.    SIPC's employment of Felleman, especially after she brought the AICPA Code of Professional Conduct and the CFA Institute Code of Ethics and Standards of Professional Conduct

to its attention, created a sufficiently close relationship that necessarily implicated Felleman's well-being. Specifically, Felleman pleaded with SIPC to not place her in the position of having to choose between a constructive discharge or violating her ethical obligations – exposing her to the possibility of losing her CPA license.

185.   SIPC's refusal to assist Felleman in addressing her ethical concerns with the Portal Project, and its insistence that she continue to work on the Project, forced Felleman to either continue her employment with SIPC – jeopardizing not only her employment with SIPC and but any future positions she may obtain – or suffer a constructive discharge along with lost wages and benefits.

186.   SIPC's conduct has actually and proximately caused Felleman to suffer lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, and reimbursement for lost benefits.

**COUNT VI**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT SIPC**

187.   Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

188.   A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C. 1984).

189.   Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

190.    The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

191.    A plaintiff may recover for negligent infliction of emotional distress if "the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth*, 589 A.2d at 810–11.

192.    Physical manifestation of a mental or emotional injury is no longer required in this jurisdiction. *See id*. at 797; *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991).

193.    Similarly, the "zone of physical danger" test is no longer the sole test to apply to negligent infliction of emotional distress cases in this jurisdiction. *Hedgepeth*, 589 A.2d at 800 (adopting "special relationship or undertaking" rule as supplemental to the "zone of physical danger" rule).

194.    Felleman was employed by SIPC to perform duties that required Felleman to adhere to the AICPA Code of Professional Conduct as well as the CFA Institute's Code of Ethics and Standards of Professional Conduct ("CFA Code")

195.    SIPC was aware of Felleman's obligation to follow the AICPA Code of Professional Conduct and the CFA Code.

196.    SIPC's employment of Felleman, especially after she brought her obligations under the AICPA Code of Professional Conduct and the CFA Code to its attention, created a sufficiently close relationship that necessarily implicated Felleman's well-being. Specifically, Felleman was asking Defendant to not place her in the position of having to choose between resigning her

position or violating her ethical obligations – exposing her to the possibility of losing her CPA license.

197.   SIPC's refusal to assist Felleman in addressing her ethical concerns with the Portal Project, and its insistence that she continue to work on the Project, created an especially likely risk that its negligence would cause Felleman serious emotional distress.

198.   By refusing to address Felleman's ethical concerns and insisting that she continue working on the Portal project—despite knowing that her doing so would cause her to violate the AICPA and the CFA Code – SIPC forced Felleman to resign her employment, and in doing so, caused Felleman to suffer significant emotional distress.

199.   SIPC's negligent actions in breach of its obligations to Felleman have in fact caused her serious emotional distress. Her emotional distress was so severe that in early- to mid-2022, any mention of the Portal Project to Felleman would cause her hands to visibly shake.

200.   SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

## COUNT VII
## NEGLIGENT SUPERVISION
## AGAINST DEFENDANT SIPC

201.   Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

202.   "There are circumstances under which an employer can be held liable for intentional acts committed by an employee who causes harm, although acting outside the scope of his or her employment. That liability is predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence."

*Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002); *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 63 (D.C. 1983) (holding this theory of liability is not predicated on respondeat superior, but rather is direct liability to the employer).

203.    "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless in the supervision of the activity." Restatement (Second) Agency § 213©.

204.    To invoke the theory of negligent supervision, a party must show that "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

205.    Plaintiff's must "identify the individual[s] over whom [Defendant] had a duty to supervise, such that the failure to properly exercise this duty would give rise to a negligent supervision claim by the plaintiff." *Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 100 (D.D.C. 2010).

206.    An employer is generally liable for an employee's tortious conduct only if the employee was acting "within the scope of their employment." *Boykin v. District of Columbia*, 484 A.2d 560, 561 (D.C. 1984).

207.    Under District of Columbia law, as predicted by federal court, the tort of negligent hiring and supervision does not require showing that complainant suffered physical injury. *Cf. Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 81 (D.D.C. 2005).

208.    SIPC as an employer had a duty to supervise the actions of its employees, including Directors and Officers such as Slacik, Wang, Glover, and Saperstein.

209.    SIPC, through the actions and inactions of Slacik, *see* Compl. *supra* ¶¶ 100-118; Wang, *see* Compl. *supra* ¶¶ 119-136; Glover, *see* Compl. *supra* ¶¶ 137-162; and Saperstein, *see* Compl. *supra* ¶¶ 163-177, taken within the scope of their employment, knew or should have known that its employees were acting in an incompetent manner regarding the Portal Project.

210.    Felleman notified SIPC of the potential for fraud and misuse of funds in the Portal Project, including several timely delays and cost overruns.

211.    SIPC knew or should have known the problems directly impacted Felleman's ability to perform her role as SIPC's Manager - Investments. As Felleman explained to Glover, the inaccurate numbers produced by the Portal impacted all the work she performed. *See* Compl. *supra* ¶ 65.

212.    SPIC knew or should have known that the problems created inaccurate assessment and interest charges for SIPC's member broker-dealers, which they knew directly impacted Felleman's ability to perform her role as SIPC's Manager - Investments because those assessment and interest charges were a significant contributor to the SIPC fund.

213.    SPIC knew or should have known that by refusing to allow Felleman and the Finance Department access to the Portal's database, when they knew that their lack of access was resulting in inaccurate data going into and out of the Portal, it impacted Felleman's ability to perform her role as SIPC's Manager - Investments.

214.    SIPC knew or should have known that by refusing to address Felleman's concerns with the Portal Project, it was refusing to consider Felleman's duty as a CPA and CFA to abide by the mandates of the AICPA and the CFA Code.

215.     SIPC knew or should have known Felleman's ethical and professional duties under the AICPA and the CFA Code prevented her from working on the Portal Project and even with SIPC because of SIPC's refusal to remedy the problems with the Portal.

216.     Even with all of this actual or constructive knowledge, SIPC failed to adequately supervise Slacik, Wang, Glover, and Saperstein, who refused to remedy the problems with the Portal Project, and who knew that their refusal would have caused Fellemen to violate her ethical and professional duties under the AICPA and the CFA Code, which resulted in Felleman's constructive discharge.

217.     SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

<u>COUNT VIII</u>
**COMMON LAW NEGLIGENCE**
**AGAINST DEFENDANT SLACIK**

218.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104 as if fully set forth herein.

219.     A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

220.     Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

221.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

222.    While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

223.    In Felleman's September 2022 letter to Slacik, detailing the Portal's mismanagement, dysfunction, possible instances of conflict of interest, fraud, waste, and abuse, she concluded by imploring Slacik to help her, writing, "I am hopeful that you and the Board will take action to improve this situation for the benefit of SIPC, and for my personal well-being." *See* Compl. *supra* ¶ 60. Felleman explicitly told Slacik, that, "[a]s a CPA and a CFA, I operate under a code of professional ethics. It is my duty to report suspected fraud, and I take this responsibility seriously."

224.    Felleman's September 2022 letter to Slacik, an agent of employer SIPC, unequivocally demonstrates the duty owed to Felleman, an SIPC employee, to take appropriate

action in response to her concerns about the Portal project, and to ensure that SIPC would not require Felleman to violate her professional codes of ethics.

225.    Slacik, acting in her official capacity as Chair of SIPC's Board, breached that duty when Slacik failed to take any action to correct the problems which Felleman identified in her September 2022 letter and when she rubber-stamped the cursory "investigation" done in response to Felleman's complaints.

226.    When Felleman responded to Slacik and Post, asking in disbelief how she was supposed to do her job, Post summarily replied that if she did not have a preference of either continuing to work on the project or being taken off the project, the expectation would be for her to continue working on the project and "do your normal job duties faithfully." Slacik did not provide Felleman with any other options.

227.    Slacik breached the duty of care owed to Felleman when she failed to take action to ensure that Felleman could perform her role as SIPC's Manager - Investments without running afoul of her professional and ethical obligations as a CPA and CFA.

228.    Slacik's breach of this duty proximately caused Felleman's damages, namely lost wages, and benefits.

229.    Slacik's actions constitute "meaningful participation in the wrongful acts" in that her act of rubberstamping the sham investigation and requiring Felleman to risk violating her professional ethical obligations, and her failure to act in response to Felleman's September 2022 detailing Felleman's concerns of mismanagement, dysfunction, possible instances of conflict of interest, fraud, waste, and abuse, can "logically lead to the inference that [Slacik] had a share in the wrongful acts of [SIPC]."

230.    Slacik's conduct has actually and proximately caused Felleman to suffer lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, and reimbursement for lost benefits.

**COUNT IX**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT SLACIK**

231.    Plaintiff realleges and incorporates Paragraphs 1-12, 25-99, 101-104, and 218-230 as if fully set forth herein.

232.    A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

233.    Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

234.    The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

235.    A plaintiff may recover for negligent infliction of emotional distress if "the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth,* 22 A.3d at 810–11.

236.    Physical manifestation of a mental or emotional injury is no longer required in this jurisdiction. *See id*. at 797; *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991).

237.    Similarly, the "zone of physical danger" test is no longer the sole test to apply to negligent infliction of emotional distress cases in this jurisdiction. *Hedgepeth*, 589 A.2d at 800 (adopting "special relationship or undertaking" rule as supplemental to the "zone of physical danger" rule).

238.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

239.    While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

240.    In Felleman's September 2022 letter to Slacik, detailing the Portal's mismanagement, dysfunction, possible instances of conflict of interest, fraud, waste, and abuse, she concluded by imploring Slacik to help her, writing, "I am hopeful that you and the Board will take action to improve this situation for the benefit of SIPC, and for my personal well-being." *See* Compl. *supra* ¶ 60. Felleman explicitly told Slacik, that, "[a]s a CPA and a CFA, I operate under a

code of professional ethics. It is my duty to report suspected fraud, and I take this responsibility seriously."

241.    Felleman's September 2022 letter to Slacik, an agent of employer SIPC, unequivocally demonstrates Slacik's duty owed to Felleman, an SIPC employee, to take appropriate action in response to her concerns about the Portal project, and to ensure that SIPC would not require Felleman to violate her professional codes of ethics.

242.    Slacik, acting in her official capacity as Chair of SIPC's Board, breached that duty when she failed to take any action to correct the problems Felleman identified in her September 2022 letter and when she rubber-stamped the sham "investigation" done in response to Felleman's complaints.

243.    When Felleman responded to Slacik and Post, asking in disbelief how she was supposed to do her job, Post summarily replied that if she did not have a preference of either continuing to work on the project or being taken off the project, the expectation would be for her to continue working on the project and "do your normal job duties faithfully." Slacik did not provide Felleman with any other options.

244.    Slacik breached the duty of care owed to Felleman when she failed to take action to ensure that Felleman could perform her role as SIPC's Manager - Investments without running afoul of her professional and ethical obligations as a CPA and CFA.

245.    By refusing to address Felleman's ethical concerns and insisting that she continue working on the Portal project—despite knowing that her doing so would cause her to violate the AICPA and the CFA Code—Slacik, as agent of SIPC, forced Felleman to resign her employment, and in doing so, caused Felleman to suffer significant emotional distress.

246.    Slacik's negligent actions in breach of her obligations to Felleman have in fact caused Felleman serious emotional distress. Her emotional distress was so severe that in early- to mid-2022, any mention of the Portal Project to Felleman would cause her hands to visibly shake.

247.    Slacik's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

248.    Slacik's actions constitute "meaningful participation in the wrongful acts" in that her act of rubberstamping the sham investigation and requiring Felleman to risk violating her professional ethical obligations, and her failure to act in response to Felleman's September 2022 detailing Felleman's concerns of mismanagement, dysfunction, possible instances of conflict of interest, fraud, waste, and abuse, can "logically lead to the inference that [Slacik] had a share in the wrongful acts of [SIPC]."

249.    Slacik's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

### COUNT X
### COMMON LAW NEGLIGENCE
### AGAINST DEFENDANT WANG

250.    Plaintiff realleges and incorporates Paragraphs 1-12, 25-99, 101-104, and 125-132, as if fully set forth herein.

251.    A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

252.     Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

253.     D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

254.     While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

255.     As SIPC's Chief Executive Officer with discretionary authority, Wang had the duty to Felleman to refrain from requiring Felleman to work in a manner that would cause her to violate her professional code of ethics.

256.     By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Wang breached the duty of care owed to Felleman.

257.     Wang's breach of this duty proximately caused Felleman's damages, namely lost wages and benefits.

258.     Wang's actions, *see* Compl. ¶¶ 125-132, constitute "meaningful participation in the wrongful acts" in that the act of knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position can "logically lead to the inference that [Wang] had a share in the wrongful acts of [SIPC]."

259.     Wang's conduct has actually and proximately caused Felleman to suffer lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, and reimbursement for lost benefits.

## COUNT XI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANT WANG

260.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 101-104, 125-132, and 250-259 as if fully set forth herein.

261.     A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

262.     Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

263.     The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

264.    A plaintiff may recover for negligent infliction of emotional distress if "the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Id*. 810–11.

265.    Physical manifestation of a mental or emotional injury is no longer required in this jurisdiction. *See id.* at 797; *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991).

266.    Similarly, the "zone of physical danger" test is no longer the sole test to apply to negligent infliction of emotional distress cases in this jurisdiction. *Hedgepeth*, 589 A.2d at 800 (adopting "special relationship or undertaking" rule as supplemental to the "zone of physical danger" rule).

267.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

268.    While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or

omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

269.    By refusing to address Felleman's ethical concerns and insisting that she continue working on the Portal project—despite knowing that her doing so would cause her to violate the AICPA and the CFA Code—Wang, as agent of SIPC, forced Felleman to resign her employment, and in doing so, caused Felleman to suffer significant emotional distress.

270.    Wang's negligent actions in breach of her obligations to Felleman have in fact caused Felleman serious emotional distress. Her emotional distress was so severe that in early- to mid-2022, any mention of the Portal Project to Felleman would cause her hands to visibly shake.

271.    Wang's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

272.    Wang's actions constitute "meaningful participation in the wrongful acts"--in that she knowingly ignored Felleman's ethical concerns about the Portal Project, silenced Felleman's concerns, and required her to continue working on the Portal Project knowing that her doing so would cause Felleman to risk violating her professional ethical obligations, *see* Compl. ¶¶ 125-132—all of which can "logically lead to the inference that [Wang] had a share in the wrongful acts of [SIPC]."

273.    Wang's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

## COUNT XII
## COMMON LAW NEGLIGENCE
## AGAINST DEFENDANT GLOVER

274.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, 101-104, and 143-158 as if fully set forth herein.

275.     A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

276.     Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

277.     D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

278.     While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

279.     As SIPC's VP of Finance with discretionary authority, Glover had the duty to Felleman to refrain from requiring Felleman to work in a manner that would require her to violate her professional code of ethics.

280.     By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Glover breached the duty of care owed to Felleman.

281.     Glover's breach of this duty proximately caused Felleman's damages, namely lost wages and benefits.

282.     Glover's actions, *see* Compl. ¶¶ 143-158, constitute "meaningful participation in the wrongful acts" in that the act of knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position can "logically lead to the inference that [Glover] had a share in the wrongful acts of [SIPC]."

283.     Glover's conduct has actually and proximately caused Felleman to suffer lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, and reimbursement for lost benefits.

### COUNT XIII
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST DEFENDANT GLOVER

284.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, 101-104, 143-158, and 274-283 as if fully set forth herein.

285.     A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

286.    Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

287.    The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

288.    Under this theory of liability, a plaintiff may recover for negligent infliction of emotional distress if "the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Hedgepeth,* 22 A.3d at 810–11.

289.    Physical manifestation of a mental or emotional injury is no longer required in this jurisdiction. *See id*. at 797; *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991).

290.    Similarly, the "zone of physical danger" test is no longer the sole test to apply to negligent infliction of emotional distress cases in this jurisdiction. *Hedgepeth*, 589 A.2d at 800 (adopting "special relationship or undertaking" rule as supplemental to the "zone of physical danger" rule).

291.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not

authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

292. While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

293. By refusing to address Felleman's ethical concerns and insisting that she continue working on the Portal project—despite knowing that her doing so would cause her to violate the AICPA and the CFA Code—Glover, as agent of SIPC, forced Felleman to resign her employment, and in doing so, caused Felleman to suffer significant emotional distress.

294. Glover's negligent actions in breach of his obligations to Felleman have in fact caused her serious emotional distress. Her emotional distress was so severe that in early- to mid-2022, any mention of the Portal Project to Felleman would cause her hands to visibly shake.

295. Glover's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

296. Glover's actions constitute "meaningful participation in the wrongful acts"--in that he attempted to silence Felleman's concerns with warnings about Wang's retaliating against Wons when he complained about the Portal Project; he knew there were problems with the Portal Project which implicated Felleman's professional ethical obligations, yet, he insisted that Felleman merely

remain quiet and keep working on the Portal Project, *see* Compl. ¶¶ 143-158—all of which can "logically lead to the inference that [Glover] had a share in the wrongful acts of [SIPC]."

297.    Glover's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

## COUNT XIV
## COMMON LAW NEGLIGENCE
## AGAINST DEFENDANT SAPERSTEIN

298.    Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, 101-104, and 169-173, as if fully set forth herein.

299.    A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

300.    Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

301.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

302.    While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

303.    As SIPC's VP of Operations with discretionary authority, Saperstein had the duty to Felleman to refrain from requiring Felleman to work in a manner that would cause her to violate her professional code of ethics.

304.    By failing to take action, by knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position, Saperstein breached the duty of care owed to Felleman.

305.    Saperstein's breach of this duty proximately caused Felleman's damages, namely lost wages and benefits.

306.    Saperstein's actions, *see* Compl. ¶¶ 169-173, constitute "meaningful participation in the wrongful acts" in that the act of knowingly placing Felleman in the Catch 22 of either continuing her job and thereby violating her ethical and professional obligations or forcing her to resign her position can "logically lead to the inference that [Saperstein] had a share in the wrongful acts of [SIPC]."

307.    Saperstein's conduct has actually and proximately caused Felleman to suffer lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, and reimbursement for lost benefits.

**COUNT XV**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST DEFENDANT SAPERSTEIN**

308.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, 101-104, 169-173, and 298-307 as if fully set forth herein.

309.     A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach. *See, e.g., District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984).

310.     Where a plaintiff's injury was "reasonably foreseeable" to defendant, the defendant owed plaintiff a duty to avoid causing that injury. *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011).

311.     The close relationship between a plaintiff and defendant should inform the Court about the scope of defendant's duty to plaintiff to avoid harm.

312.     A plaintiff may recover for negligent infliction of emotional distress if "the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Id*. 810–11.

313.     Physical manifestation of a mental or emotional injury is no longer required in this jurisdiction. *See id*. at 797; *Jones v. Howard University, Inc.*, 589 A.2d 419, 424 (D.C. 1991).

314.     Similarly, the "zone of physical danger" test is no longer the sole test to apply to negligent infliction of emotional distress cases in this jurisdiction. *Hedgepeth*, 589 A.2d at 800 (adopting "special relationship or undertaking" rule as supplemental to the "zone of physical danger" rule).

315.    D.C. courts have long held that "[c]orporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (internal quotations omitted); *see also Vuitch v. Furr*, 482 A.2d 811, 821 (D.C.1984) (holding that corporate officers "cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval").

316.    While a director or officer's liability is not based on their position as a director or officer of the corporation, it is based on their "meaningful participation in the wrongful acts." *Lawlor* 758 A.2d at 977. "Sufficient [meaningful] participation can exist when there is an act or omission by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense." *Id.*

317.    By refusing to address Felleman's ethical concerns and insisting that she continue working on the Portal project—despite knowing that her doing so would cause her to violate the AICPA and the CFA Code—Saperstein, as agent of SIPC, forced Felleman to resign her employment, and in doing so, caused Felleman to suffer significant emotional distress.

318.    Saperstein's negligent actions in breach of her obligations to Felleman have in fact caused her serious emotional distress. Her emotional distress was so severe that in early- to mid-2022, any mention of the Portal Project to Felleman would cause her hands to visibly shake.

319.    Saperstein's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

320.     Saperstein's actions, *see* Compl. ¶¶ 169-173, constitute "meaningful participation in the wrongful acts" in requiring Felleman to risk violating her professional ethical obligations can "logically lead to the inference that [Saperstein] had a share in the wrongful acts of [SIPC]."

321.     Saperstein's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation for all of which she seeks monetary compensation.

## COUNT XVI
## CONSTRUCTIVE DISCHARGE
## AGAINST DEFENDANT SIPC

322.     Plaintiff realleges and incorporates Paragraphs 1-13, 25-99, and 100-217, as if fully set forth herein.

323.     "A constructive discharge is legally regarded as a firing rather than a resignation." *Darrow V. Dillingham & Murphy, LLP,* 902 A.2d 135, 138 (D.C. Cir. 2006) (citation omitted).

324.     "'A constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit.'" *Darrow,* 902 A.2d at 138 (citation omitted).

325.     "The intolerability of the working conditions is judged by an objective standard, not the employee's subjective feelings." *Id.* (citation omitted). "Working conditions rise to the requisite level of intolerableness if they 'would lead a reasonable person to resign.'" *Young & Co. v. Sutherland,* 631 A.2d 354, 362 (D.C. Cir. 1993) (citations omitted).

326.     To prevail on a constructive discharge claim, "[i]t is not necessary to prove that the employer deliberately created such conditions with an intent to coerce the employee into resigning; 'it is sufficient if the employer simply tolerates discriminatory working conditions that would drive a reasonable person to resign.'" *Id.* at 364 (citation omitted). Accordingly, "proof of constructive

discharge does not require evidence that the employer intended to force the employee to quit." *Id.* at 362 (citation omitted).

327.    SIPC, through the actions and inactions of Slacik, *see* Compl. *supra* ¶¶ 100-118, 218-230, and 231-249; Wang, *see* Compl. *supra* ¶¶ 119-136, 250-259, and 260-273; Glover, *see* Compl. *supra* ¶¶ 137-162, 274-283, and 284-297; Saperstein, *see* Compl. *supra* ¶¶ 163-177, 298-307, and 308-321, created intolerable working conditions for Felleman by:

(a)    refusing to take any action to remedy the problems with the Portal Project, which problems they knew directly impacted Felleman's ability to perform her role as SIPC's Investment Manager. As Felleman explained to Glover, the poor design, development and implementation of the project impacted all the work she performed *See* Compl. *supra* ¶ 64;

(b)    refusing to take any action to remedy the problems with the Portal Project, which created potentially inaccurate assessment and interest charges for SIPC's member broker-dealers, which they knew would directly impact Felleman's ability to perform her role as SIPC's Manager - Investments because those assessment and interest charges were a significant contributor to the SIPC fund;

(c)    refusing to replace InfernoRed with another contractor after Felleman complained to SIPC about InfernoRed's excessive charges and its failure to produce an acceptable work product, when they knew that Felleman, as SIPC's Manager - Investments, was responsible for was responsible for revealing inappropriate and incorrect transactions.

(d)    refusing to permit Felleman and the Finance Department to provide input to SIPC's IT department and InfernoRed about the Finance Department's requirements for the Portal Project, when they knew that the lack of input from Felleman and the Finance

Department was resulting in inaccurate data going into and out of the Portal that, in turn, impacted Felleman's ability to perform her role as SIPC's Manager - Investments;

(e)     refusing to allow Felleman and the Finance Department access to the Portal's database, when they knew that their lack of access was resulting in inaccurate data going into and out of the Portal that, in turn, impacted Felleman's ability to perform her role as SIPC's Manager - Investments;

(f)     intimidating Felleman by reminding her of the fate Wons received (i.e., removal from the Portal Project) after he complained to Wang about problems with the Portal;

(g)     repeatedly directing Felleman to keep quiet about the problems with the Portal Project and telling her it would not turn out well for her if she did not;

(h)     repeatedly refusing to take into consideration Felleman's duty as a CPA and CFA to abide by the mandates of the AICPA;

(i)     repeatedly refusing Felleman's requests for advice and direction as to their expectations, when they knew her ethical and professional duties under the AICPA prevented her from working on the Portal Project and even with SIPC because of SIPC's refusal to remedy the problems with the Portal.

328.    SIPC, through its own actions and inactions, *see* Compl. ¶¶ 108-118, 119-136, 137-162, 163-177, 178-186, 187-200, and 201-217, created intolerable working conditions for Felleman.

329.    The working conditions at SIPC led a reasonable person to resign. Glover told Felleman that another woman in Felleman's position, Pat Kennedy, told Glover that she could not

take it anymore after working for SIPC for thirty years, and Ms. Kennedy proceeded to resign, even after Glover tried to talk her into staying at SIPC.

330.   SIPC's actions and inactions as discussed herein, s*ee* Compl. *generally,* created a prohibited ethical conflict under the AICPA and the CFA Code for Felleman.

331.   Felleman encountered an obstacle in following an appropriate course of action with regard to the Portal due to internal pressures put on her by SIPC, in violation of section 2.000.020.01 of the AICPA Code of Conduct.

332.   Because this ethical conflict remained unresolved after Felleman's numerous yet unsuccessful attempts beseeching Slacik, Wang, Glover, and Saperstein to take action, Felleman would have been in violation of one or more rules of the AICPA if she had remained associated with the Portal Project and was thus obligated to consider whether she could continue her relationship with the Portal Project and/or SIPC. *See* AICPA Code of Conduct § 2.000.020.06.

333.   The AICPA Code of Conduct provides that a member, when responding to an organization's noncompliance with laws and regulations, must determine whether further action is necessary, which depends on various factors which include, but are not limited to:

    a.   The pervasiveness of the matter throughout the employing organization

    b.   Whether the member who is a senior professional accountant continues to have confidence in the integrity of the member's superiors and, if applicable, those charged with governance

    c.   Whether the noncompliance or suspected noncompliance is likely to reoccur

    d.   Whether there is credible evidence of actual or *potential* substantial harm to the interests of the employing organization, investors, creditors, employees, or the general public.

AICPA Code of Conduct, 2.180.010., 23 (emphasis added).

334.    The AICPA Code of Conduct defines "further action" to include:

a.    Informing the management of the parent entity of the matter if the employing organization is a member of a group

b.    Resigning from the employing organization

c.    Reporting the noncompliance or suspected noncompliance to an appropriate authority unless prohibited by laws or regulations

AICPA Code of Conduct, 2.180.010, .25.

335.    It was obvious to Felleman by December 2022 that SIPC had no intention whatsoever of remedying the problems with the Portal which she had brought repeatedly to the attention of SIPC's Officers and to the Chair of its Board. Even Glover acknowledged the problems with the Portal which Felleman uncovered, but refused to go against Wang because he knew if he did so he would wind up being on the losing end of the confrontation.

336.    Because of the continued refusal by SIPC's Officers and the Chair of its Board to remedy these problems with the Portal—which had the potential to substantially harm its members, SIPC itself, and the general public--Felleman had no confidence in the integrity of its Officers or Board, and she knew SIPC's noncompliance was very likely to reoccur—just as it had been for the prior three years.

337.    Accordingly, Felleman was compelled to take appropriate "further action" as defined in AICPA Code of Conduct 2.180.010, by resigning from SIPC.

338.    Similar to her obligations under the AICPA, Felleman had a duty of loyalty under the CFA Code to SIPC's clients and was required to act "with reasonable care and exercise prudent judgment." Felleman knew that she would not be acting with reasonable care and exercising prudent judgment if she had followed the dictates of SIPC's officers and directors and remained

quiet and continued to work on the Portal Project, knowing the Portal had flaws which would directly impact the SIPC's members.

339. SIPC gave Felleman no indication whatsoever that it intended to involve the Finance Department in addressing the problems with the Portal Project. Instead, SIPC gave Felleman every indication that it intended to plough ahead with the Portal Project--despite knowing that the financial figures being produced by the Portal were inaccurate.

340. As a result, Felleman knew that if she continued working for SIPC, she would violate the CFA Code.

341. SIPC tolerated Slacik, Wang, Glover, and Saperstein putting Felleman in the Catch 22 of requiring her to keep quiet about the problems with the Portal Project and continuing to work for SIPC--and thus violate her professional and ethical obligations--or resigning.

342. On December 19, 2022, Felleman notified Glover in writing that she was resigning her position at SIPC, and that her last day of work will be December 30, 2022.

343. On December 20, 2022, Glover accepted Felleman's resignation, stating in writing, "Thank you for your service to SIPC, we wish you all the best in the years ahead."

344. SIPC's conduct has actually and proximately caused Felleman to suffer physical injuries, emotional distress, embarrassment, humiliation, and lost wages and benefits, compensation for which she seeks backpay with pre- and post-judgment interest, front pay, reimbursement for lost benefits, and compensation for emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Elizabeth O. Felleman respectfully requests that this Honorable Court enter judgment in her favor on all Counts of her Complaint and against Defendants SIPC,

Claudia Slacik, Josephine Wang, Charles Glover, and Karen Saperstein, and that she be awarded the following relief:

      a.      Entry of judgment in favor of Plaintiff on all Counts;

      b.      Award of back pay for Plaintiff against Defendants;

      c.      Award of damages for Plaintiff's lost benefits against Defendants;

      d.      Award of front pay for Plaintiff against Defendants;

      e.      Award of damages for Plaintiff's emotional, mental, and physical distress damages;

      f.      Award of pre- and post-judgment interest for Plaintiff; and

      g.      Any other relief that this Court deems equitable, appropriate, and just.

### DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Elizabeth O. Felleman hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Valerie A. Teachout*
Valerie A. Teachout, Esq. (DC Bar No. 1015719)
THE SPIGGLE LAW FIRM, P.C.
3601 Eisenhower Avenue, Suite 425
Alexandria, Virginia 22304
V. Teachout Direct Line: (571) 513-6942
Main Line: (202) 449-8527
Facsimile: (202) 517-9179
E-mail : vteachout@spigglelaw.com

*Counsel for Plaintiff*